[No. 12335-9-III.   Division Three.   June 2, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSE R.
LOPEZ, *Appellant*.

*Carl G. Sonderman,* for appellant.

*Dennis DeFelice, Prosecuting Attorney,* and *Kevin P. Donnelly,* and *David M. Sandhaus, Deputies,* for respondent.

THOMPSON, C.J. — Jose R. Lopez appeals his jury convictions for first degree murder and homicide by abuse for the killing of his 4-week-old stepson, Leonel. He assigns error to the trial court's ruling which allowed the State to cross-examine him using statements he made to a court appointed psychiatrist.[1] We affirm.

Jose Lopez and Marie Irene Saldana lived together for 3 or 4 years prior to Leonel's birth in March 1991. They had a 3-year-old daughter. A short time before Ms. Saldana gave birth to Leonel, Mr. Lopez learned that the conception occurred at a

---

[1]He also raises other issues which we have addressed separately in an unpublished opinion.

time when he was incarcerated for assault. Ms. Saldana told him her pregnancy was the result of a rape. According to Ms. Saldana and the personnel of the clinic which was providing her prenatal care, Mr. Lopez was very angry. Ms. Saldana took refuge in a women's shelter, but after Leonel was born, she returned to the apartment she shared with Mr. Lopez.

Ms. Saldana testified that Mr. Lopez mistreated Leonel. She saw him at various times put his feet on the baby, cover the baby's mouth to stop his crying, and hold the baby by gripping his head with his hands. On the morning of April 5, 1991, she did not feel well. She went into the bathroom and closed the door. At first, she could hear the baby crying, but after she flushed the toilet, it was quiet. She decided to check on Leonel, and discovered he "didn't have any strength [in] his head". She told Mr. Lopez to call the police.

Leonel was rushed to Our Lady of Lourdes Hospital where medical personnel attempted to revive him. Although they were able to reestablish a heartbeat, Leonel was brain dead. Ms. Saldana assented to removal of life support systems. Because there was no evident cause of death, the baby's body was sent to Seattle for an autopsy by a doctor who specialized in research of sudden infant death syndrome.

The autopsy revealed that Leonel's death was the result of three major injuries to the head caused by blunt, forceful impacts. Leonel had also suffered fractures to the ribs, and his blood contained a lethal level of cocaine. Leonel's heart showed evidence of a heart attack which occurred shortly before he died. The doctor who performed the autopsy testified there was no doubt in his mind that the injuries were intentionally caused.

When the police were notified of the autopsy findings, they questioned both Ms. Saldana and Mr. Lopez. Mr. Lopez was interviewed on April 11 and 12 by Pasco police officers James Hathaway and David Allen, and Detective Richard Morrell of the Richland Police Department. These officers testified that Mr. Lopez told them he could not understand the autopsy findings. He also stated he had accidentally

dropped Leonel in the kitchen as he was taking some pills, then he accidentally hit Leonel's head on the door frame between the kitchen and living room.

When the officers insisted that Leonel's injuries could not have happened the way Mr. Lopez described, he changed his explanation. In response to the officers' questions, he admitted it was possible that Leonel had rolled under his rocking chair, and he inadvertently rocked the chair onto the baby's head. The officers then pointed out that a 4-week-old baby does not have the ability to roll and that Mr. Lopez did not own a rocking chair. Under his breath, Mr. Lopez said, "I held the kid by the shirt and swung him into the wall".

Mr. Lopez testified in his own defense. He stated he loved Leonel. When he came out of the bathroom after taking a shower that morning, Ms. Saldana had just discovered that Leonel was not breathing. He called 911. She told Mr. Lopez she had dropped Leonel. After they were advised Leonel was brain dead, they discussed what they should say if the police questioned them. At that point, Mr. Lopez agreed to say it was he who dropped the baby. He changed his mind when Ms. Saldana and his daughter came to visit him at the jail and he saw that his daughter had bruises.

On cross examination, the prosecutor asked Mr. Lopez whether he remembered talking to a doctor at Eastern State Hospital. Defense counsel objected on the ground the medical examination had been conducted in anticipation of a diminished capacity defense. The court ordered the jury removed. Counsel argued that because Mr. Lopez had withdrawn his diminished capacity defense, the court should exclude any impeachment using statements Mr. Lopez made to the psychiatrist. Defense counsel also argued that the prejudicial effect of referring to the evaluation and thereby causing the jurors to speculate why Mr. Lopez was at Eastern outweighed any probative value of the statements. The court permitted the questions. It held Mr. Lopez, by taking the stand, consented to cross examination on prior statements inconsistent with his trial testimony.

When court reconvened in the jury's presence, the prosecutor asked Mr. Lopez whether he told the psychiatrist that he hated Leonel; that he believed Ms. Saldana had taken Leonel to see his biological father; that he was in the habit of taking the baby into the shower with him; that he did not believe Ms. Saldana had been raped; and that he was angry at the child, Ms. Saldana, and the child's father.

The jury returned guilty verdicts.

Mr. Lopez contends the trial court erred when it allowed the State to impeach him using the statements he made to the psychiatrist.

The Washington cases cited by both parties are not on point. In *State v. Hutchinson*, 111 Wn.2d 872, 883, 766 P.2d 447 (1989), the issue was whether a defendant who indicated he might assert a diminished capacity defense at trial had to submit to a pretrial psychiatric evaluation. The court, at page 884, held he was so required, but he could refuse to answer any question if he believed the answer would tend to incriminate him or lead to evidence of an incriminating nature. In *State v. Pawlyk*, 115 Wn.2d 457, 466, 800 P.2d 338 (1990), the court held the defendant's right against self-incrimination was not violated by a trial court order that the defense disclose the findings and conclusions of its retained psychiatrist. Both *Hutchinson* and *Pawlyk* were appeals from interlocutory pretrial rulings concerning discovery. Here, the issue concerns use of the psychiatric report for impeaching the defendant who took the stand.

■ The State has provided the court with authority from other jurisdictions which have considered the precise issue presented here. In *Lanari v. People*, 827 P.2d 495, 501 (Colo. 1992), the court reasoned that such statements may be used for impeachment even in situations in which the defendant has withdrawn his diminished capacity defense. It reasoned at page 501:

> Underlying this rule of limited admissibility [for impeachment purposes] is the recognition that the search for truth is a fundamental characteristic of criminal proceedings which . . . should be encouraged rather than impeded; the acknowledgement that false or perjurious testimony by a defendant would

subvert that essential function; and the conclusion that if the prosecution were prohibited from utilizing for impeachment purposes voluntary statements that contradict a defendant's testimony at trial, no effective means would be available to prevent the defendant from testifying falsely.

The court held that use of the statements for impeachment purposes did not violate the defendant's privilege against self-incrimination. *Lanari*, at 502. *See also Felde v. Blackburn*, 795 F.2d 400 (5th Cir. 1986), *aff'd*, 817 F.2d 281, *cert. denied*, 484 U.S. 873 (1987).

The same rationale applies here. In addition, support by analogy is provided by cases holding defendants who exercise their right to testify are subject to impeachment by prior inconsistent statements. *e.g., see Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). The trial court correctly allowed the State to use Mr. Lopez' prior inconsistent statements to the psychiatrist to impeach him when he took the stand in his own defense.

Affirmed.

Pursuant to RCW 2.06.040, the remaining contentions and the court's answers to those contentions, having no precedential value, have not been published.

MUNSON and SCHULTHEIS, JJ., concur.

Review denied at 125 Wn. 2d 1006 (1994).