959 P.2d 1061 (1998)
135 Wash.2d 863
The STATE of Washington, Petitioner,
v.
Darrin Rand HUTCHINSON, Sr., Respondent.
No. 65876-5.
Supreme Court of Washington, En Banc.
Argued March 24, 1998.
Decided July 30, 1998.
Reconsideration Denied September 16, 1998.
*1063 Russell Hauge, Kitsap County Prosecutor, Pamela Loginsky, Deputy Kitsap County Prosecutor, Port Orchard, Amicus Curiae on behalf of Washington Association of Prosecuting Attorneys.
Ketherine Collings, Port Orchard, Amicus Curiae on behalf of Washington Association of Sheriffs.
William Hawkins, Island County Prosecutor, Coupeville, Christine Gregoire, Attorney General, Gregory P. Canova, Todd Bowers, Assistant Attorney Generals, Seattle, for Petitioner.
Jones, Ross, Besman & Connolly, Kathryn Ross, Seattle, Paul Wasson, II, Spokane, for Respondent.
*1062 DOLLIVER, Justice.
We granted review of the Court of Appeals decision reversing Defendant's convictions for two counts of aggravated first degree murder. State v. Hutchinson, 85 Wash.App. 726, 733, 938 P.2d 336 (1997) (Hutchinson II). We now affirm the Defendant's convictions.
On November 14, 1987, Island County Sheriff Deputies Saxerud and Heffernan arrested the Defendant, Darrin Rand Hutchinson, *1064 at the Clinton ferry terminal for driving under the influence. A search incident to arrest failed to yield a .32 caliber handgun which the Defendant concealed inside the waistband of his pants.
The Defendant rode in the backseat of the patrol car to the Sheriff's office in Coupeville, where the deputies drove into the garage and closed the door behind them. After removing their own service revolvers and placing them in a lockbox, the officers escorted the Defendant inside to administer a breathalyzer. At approximately 6 a.m., the Defendant, using his own gun, shot both deputies to death. Deputy Saxerud received a single gunshot wound to the side of the head, fired from close range. Deputy Heffernan received two gunshot wounds to the head, fired from two feet or more away.
After shooting the deputies, the Defendant removed the key from Deputy Saxerud's pocket and stole the patrol car, ramming it through the locked garage door to escape. The Defendant drove first to his brother's house and told him what had happened. Following his brother's advice, the Defendant drove the patrol car over the edge of a steep ravine to "get it out of [there]," then walked to his parents' house. Verbatim Report of Proceedings at 1044 (June 12, 1989).,
Sergeant Ridley, an 11-year veteran of the Island County Sheriff's Department, arrested the Defendant at his parents' house shortly thereafter. Sergeant Ridley was well-acquainted with the Defendant through prior contacts. After handcuffing the Defendant, Sergeant Ridley read him his rights. The Defendant stated he understood and wanted to speak to the police. Sergeant Edwards, another Island County Deputy, then appeared and asked Sergeant Ridley to reread the Defendant his rights in Edwards' presence. Sergeant Ridley did so, and, after saying once that he did not understand, the Defendant stated he understood his rights and would speak with police.
The Defendant rode with Sergeant Ridley and Deputy Lavoie to the Island County Jail. During that time, he told the officers that he had been arrested that morning by Deputies Saxerud and Heffernan, whom he shot because they were assaulting him. The officers who came into contact with the Defendant after his arrest testified he did not appear to be intoxicated. The Defendant stated he was not intoxicated.
Chief Criminal Deputy Ron Panzero of the Skagit County Sheriff's Department joined Sergeant Ridley and the Defendant in a large interrogation room. Deputy Panzero placed a tape recorder on the table in front of the Defendant, turned it on, and read him his rights again. The Defendant did not want to sign a written waiver but again stated he wanted to speak to the officers and tell them the events surrounding the murders of Deputies Saxerud and Heffernan. The Defendant initially stated he did not care whether the statement was taped. The tape recording began at 8:50 a.m. After several minutes, the Defendant told the officers that speaking with the tape recorder running made him nervous. At the Defendant's request, the tape was turned off at 8:58 a.m. The Defendant continued to speak freely about the shootings for approximately 20 minutes, then requested that the tape recorder be turned on after Deputy Panzero told him he was talking too fast for the officers to write down his statement accurately. It was not noted on the tape what time recording ensued.
Later that evening, Deputy Panzero and Sergeant Ridley visited the Defendant in the jail and read him his rights for the fourth time that day. The Defendant asked to speak with an attorney, and the officers immediately ended the interview. The Defendant had not previously asserted his right to remain silent or to have counsel present.
The Defendant was charged with two counts of aggravated first degree murder. Prior to trial, he underwent intelligence quotient (IQ) testing at the Island County Jail. The test results showed he had a verbal IQ of 78, a performance IQ of 85, and a full-scale IQ of 79. The Defendant's IQ indicated he was in the range from borderline intellectual functioning to low average. His score on the comprehension subtest of the IQ examination was within the average range. The trial court denied the defense motion to exclude the statements made by the Defendant.
*1065 The Defendant also moved to appear at trial without physical restraints of any kind. After a hearing at which Island County Chief Deputy Proft testified to differing methods of restraint, the court required the Defendant to wear a leg brace under his clothing on one leg. The other leg would be chained to a device in the floor under counsel table, which was skirted, thereby rendering the restraints invisible to the jury. The Defendant's hands were not to be shackled. The court examined these proposed arrangements from the perspective of the jurors to determine whether the restraints would be visible. Following the inspection, the court stated it could see nothing which would indicate to the jurors that the Defendant was shackled.
The Defendant attempted to introduce evidence at trial of the victims' character. Specifically, the defense wished to introduce Deputy Heffernan's performance evaluation from 1980, in which a superior officer stated Deputy Heffernan "lost his composure" and was "aggressive" and "physical" with intoxicated arrestees. Verbatim Report of Proceedings at 37 (May 12, 1989). In addition, the defense made offers of proof regarding the reputation of the Island County Sheriff's Department and specific acts of violence or intimidation by Deputy Heffernan. After a hearing, the trial court allowed only the testimony of "specific witnesses if they [could] testify to the general reputation of Deputy Heffernan or Deputy Saxerud for a pertinent trait of character relevant hereto." Clerk's Papers at 344.
The trial of Defendant's case was originally set for January 25, 1988. At the omnibus hearing, held January 4, 1988, the trial court ordered the Defendant to state by no later than February 5, 1988, whether he would raise a claim of diminished capacity or voluntary intoxication. Subsequent orders from the court regarding the assertion of a diminished capacity defense went unheeded by the Defendant, and, on April 22, 1988, the State filed a motion to compel examination of the Defendant. The basis for the motion was Defendant's assertion that he might rely on the defense of diminished capacity and introduce expert psychiatric testimony in support of that defense. The Defendant's silence, therefore, would deprive the State of controverting his proof on the issue of his mental condition.
The Superior Court granted the State's motion for an order compelling the Defendant to submit to a psychiatric or psychological examination by an expert of the State's choosing. The court limited the State's use of any evidence derived from such an examination to rebuttal, and then only if the Defendant first introduced evidence of diminished capacity. The order also provided:
[T]he effect of this order is stayed until the 24th day of June, 1988, to permit the defense an opportunity to seek discretionary review of this order by the Supreme Court of the State of Washington[.]
Clerk's Papers at 1591.
We accepted discretionary review, and by order dated September 26, 1988, affirmed the requirement that the Defendant submit to an examination by the State's expert. The order also stated:
[N]either the interposing of a diminished capacity defense by Mr. Hutchinson nor his submission to this examination shall be deemed to waive his constitutional right against self-incrimination[.]
State v. Hutchinson, 111 Wash.2d 872, 874, 766 P.2d 447 (1989) (Hutchinson I). The order went on to say an explanatory opinion would be issued in due course.
Following issuance of the order, the State conceded clarification was needed to ascertain whether the Defendant could refuse to answer questions; the order was ambiguous as to how the Defendant's right against self-incrimination was to be protected during a compelled examination.
The trial date neared and the State was anxious to conduct the mental examination of the Defendant despite the fact this court's explanatory opinion had not been issued. Assistant Attorney General Gregory Canova stated:
We have been reasonable in this case in agreeing with defense counsel to wait for the [Supreme Court] opinion, but it has not been forthcoming, and we simply can't wait any longer. *1066 Verbatim Report of Proceedings at 80-81 (Jan. 9, 1989).
The State sought clarification of their expert, Dr. Muscatel's right to examine the Defendant. Defense counsel stated she would be advising the Defendant not to answer any questions. The State noted it would ask the court to strike any evidence of a diminished capacity defense if the Defendant refused to be examined by the State's expert. The court ordered the Defendant to answer Dr. Muscatel's questions.
On January 11, 1989, Dr. Muscatel attempted to examine the Defendant, but began by stating, "whatever you say does not have Fifth Amendment privileges...." Verbatim Report of Proceedings at 2 (11 a.m. Jan. 11, 1989). Interpreting that statement as a contravention of this court's order, which seemingly protected the Defendant against self-incrimination, defense counsel Kathryn Ross, who was present, informed Dr. Muscatel, "Darrin and I won't be saying anything so you will be the only one speaking." Verbatim Report of Proceedings at 2 (11 a.m. Jan. 11, 1989). The Defendant did not respond to any of Dr. Muscatel's questions.
The parties went before the trial court that day. The State explained Dr. Muscatel intended to question the Defendant about the shootings. Defense counsel explained that, "in order to preserve his 5th Amendment rights, Mr. Hutchinson must remain silent...." Verbatim Report of Proceedings at 35 (12 p.m. Jan. 11, 1989).
The State moved to exclude the testimony of defense experts as a sanction for the Defendant's refusal to be examined by the State's expert. The trial judge granted the motion stating:
[P]erhaps it would get the attention of the Supreme Court.
.... I would like to have them hear this and quickly....
. . . .
Now I've ordered the examination, it isn't taking place and I now have ordered sanctions. And I trust that somebody moves the matter to a higher authority. Verbatim Report of Proceedings at 69-72 (12 p.m. Jan. 11, 1989).
Although the court granted the State's motion to exclude the testimony of defense experts, Dr. Halpern would be allowed to testify regarding the effects of alcohol on a person's capacity to form the requisite level of intent.
Two days later, on January 13, 1989, we issued our opinion in Hutchinson I. It stated:
While the defendant has a right to the presence of counsel during such an examination, counsel may not inhibit the examination. The defendant, upon such an examination, may refuse to answer any question if he believes his answer might tend to incriminate him or lead to evidence of an incriminating nature.
We hold the defendant must submit to an examination as to mental condition and capacity by such psychiatrists as the prosecution shall choose.... Defense counsel are entitled to attend any examination of the defendant by the prosecution's expert witnesses, but may not interfere with or participate in the examination. The trial court is responsible for the protection of the constitutional rights of the defendant against self-incrimination by in camera consideration of any written report and, during the course of the trial, by exclusion of testimony pertaining to guilt.
Hutchinson I at 884-85, 766 P.2d 447 (citation omitted). The opinion also agreed with two Court of Appeals decisions which held that a defendant who asserts a diminished capacity defense waives both the physician-patient privilege and the privilege against self-incrimination. Hutchinson I at 880, 882, 766 P.2d 447 (citing State v. Brewton, 49 Wash.App. 589, 590-91, 744 P.2d 646 (1987) and State v. Nuss, 52 Wash.App. 735, 763 P.2d 1249 (1988), review denied, 112 Wash.2d 1010 (1989)). Confusion over the practical application of Hutchinson I led the Defendant to move the trial court to reconsider its order excluding defense experts.
On January 25, 1989, the trial court held a hearing on the Defendant's motion for reconsideration regarding the examination and the trial court's sanction of exclusion. Defense counsel reiterated that the Defendant's position *1067 was unchanged: he would answer no questions whatsoever. Dr. Muscatel stated that, without a meaningful examination of the Defendant, he would be unable to offer an opinion as to the Defendant's state of mind.
On February 3, 1989, the trial court denied the defense motion for reconsideration of the order regarding examination, but explained incriminating statements made by the Defendant during the State expert's examination would be suppressed at trial.
The Defendant moved again for reconsideration. The motion was denied. The third motion for reconsideration occurred March 22, 1989, during the third week of jury selection. At that time, defense counsel stated she was withdrawing previous objections to the giving of nontestimonial, psychological tests by the State's expert; however, the Defendant continued to object to Dr. Muscatel's attempt to administer a Rorschach ink blot test. And under no circumstances would the Defendant be interviewed by Dr. Muscatel or another State's expert. The trial court pointed out the Supreme Court opinion stated the Defendant must submit to an examination. The trial court again denied the motion to reconsider and based the exclusion of defense expert testimony on the Defendant's adamant refusal to answer any questions.
After the State rested its case, the Defendant again moved for reconsideration of the ruling excluding expert defense testimony. Only then did defense counsel state she was prepared to have the Defendant examined by an expert of the State's choosing, with no advance conditions set by the defense. She proposed to have the Defendant answer question by question, with counsel present. The trial court, after a hearing, found "there [had] been no changes of circumstance since the inception of the order" and denied the motion. The court stated:
The matter was not only argued at length, but on three occasions, the Court attempted without coercion on two of those occasions, but by persuasion, attempted enforcement of its order with continual refusal, and what I termed at that time, defiance. The quid pro quo for such defiance was the exclusion of those witnesses who were retained by defendant and who had made examinations of him.
Verbatim Report of Proceedings at 1478-79 (June 15, 1989).
The trial judge instructed the jury with respect to self-defense in keeping with then-existing Washington Pattern Jury Instructions: Criminal (WPIC) 16.02; instruction 24 read:
Homicide is justifiable when committed in the lawful defense of the slayer when the slayer reasonably believes that the person slain intends to inflict death or great personal injury and there is imminent danger of such harm being accomplished.
Clerk's Papers at 123.
The court also gave instruction 30, based on WPIC 16.07, which the Defendant proposed:
If a person acting as a reasonably prudent person mistakenly believes himself to be in danger of injury or of an offense being committed against him, he has the right to defend himself by the use of lawful force against that apparent injury or offense even if he is not actually in such danger.
Clerk's Papers at 129.
The jury convicted the Defendant of both counts of aggravated first-degree murder.
Division One of the Court of Appeals reversed the Defendant's conviction, holding the pattern jury instruction on self-defense was erroneous. Hutchinson II at 733. The court based its decision on State v. LeFaber, 128 Wash.2d 896, 913 P.2d 369 (1996), in which the pattern jury instruction on the general law of self-defense was found to be erroneous because a jury could read it to require that it find there was actual danger of imminent harm in order to accept a claim of self-defense. Because the jury "could have decided that the deputies attacked Hutchinson, but he was nevertheless not actually in imminent harm of great personal injury or death [;] they could have ignored the issue of his belief in that type of harm." Hutchinson II at 733.
*1068 The Court of Appeals also held the trial court erred in excluding the defense expert witnesses' testimony regarding diminished capacity. The court ruled CrR 4.7(h)(7)(i) "unqualifiedly proscribes excluding witnesses as a discovery sanction." Hutchinson II at 738.
The State petitioned for review, arguing the trial court properly instructed the jury and excluded defense expert testimony. The Defendant did not cross-appeal but argued in his answer to the State's petition for review that the trial court erroneously admitted his confession, limited character evidence, and permitted his restraint at trialall issues he raised in his pro se supplemental brief to the Court of Appeals. The Court of Appeals held the trial court properly allowed the Defendant's confession but did not reach the remaining issues. We granted review of all issues raised on appeal.
The State maintains the trial court's exclusion of defense expert testimony was the proper remedy for the Defendant's refusal to submit to an examination by the State's psychiatrist. The Defendant counters that he did not violate discovery orders or this court's directives, and, even if he did, exclusion of witness testimony was not an appropriate sanction.
Whether the Defendant disobeyed orders from this court or the trial court must be determined before the validity of an exclusion remedy can be addressed. We therefore look first to the law regarding mental defenses and, specifically, to our directives to the Defendant.
A defendant who pleads not guilty by reason of insanity waives his privilege against self-incrimination, and the work product privilege inherent in his right to counsel, and may therefore be ordered to submit to an examination by the State's mental expert. State v. Bonds, 98 Wash.2d 1, 653 P.2d 1024 (1982), cert. denied, 464 U.S. 831, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983). The issue for the trial court in this case was whether the same is true in the context of a diminished capacity defense. In granting interlocutory review in Hutchinson I, we stated:
[N]either the interposing of a diminished capacity defense by Mr. Hutchinson nor his submission to this examination shall be deemed to waive his constitutional right against self-incrimination[.]
Hutchinson I at 874 (quoting this court's order).
Our written opinion agreed with State v. Brewton, 49 Wash.App. 589, 744 P.2d 646 (1987) and State v. Nuss, 52 Wash.App. 735, 763 P.2d 1249 (1988), review denied, 112 Wash.2d 1010 (1989), which held a Defendant who asserts a diminished capacity defense, like one who pleads insanity, waives both the physician-patient privilege and the privilege against self-incrimination. Hutchinson I at 880.
We also relied on State v. Craney, 347 N.W.2d 668 (Iowa), cert. denied, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984), when we stated that an expert who conducts a compelled examination may testify to his "non-incriminatory" observations and conclusions, but may not relate "incriminatory" statements or express "`incriminatory'" opinions. Hutchinson I at 883 (quoting Craney, 347 N.W.2d at 673). Under the Craney rule, an observation or statement is not "incriminatory" merely because it tends to show the defendant is sane. In the context of diminished capacity, then, an observation or statement would not be incriminatory merely because it tended to show the defendant's capacity to premeditate or act intentionally was unimpaired. It is important to note Craney does not entitle a defendant to refuse to answer incriminating questions; it limits the State's subsequent use of a defendant's answers and expert opinions based on them.
Hutchinson I also cited RCW 10.77.020(4) when stating that the Defendant "may refuse to answer any question if he believes his answer might tend to incriminate him or lead to evidence of an incriminating nature." Hutchinson I at 884. RCW 10.77.020(4) provides a statutory right to counsel and a privilege against self-incrimination during any examination conducted "pursuant to the provisions of this chapter[.]" Chapter 10.77 RCW creates procedures for determining whether a person is competent to stand trial or is criminally insane. Where the defendant *1069 is competent and claims diminished capacity, rather than insanity, the psychiatric examination is ordered under CrR 4.7(b)(2)(viii), not RCW 10.77. We did not explain why RCW 10.77.020(4) was relevant to the Defendant's claim of diminished capacity and, in fact, note here that this statute does not apply when the defense is diminished capacity.
In State v. Pawlyk, 115 Wash.2d 457, 467, 800 P.2d 338 (1990), we clarified our prior holding and stated the Hutchinson I
reference to RCW 10.77.020(4) ... should not be read as implying that the statutory privilege against self-incrimination applies to any and all psychiatric evaluations of a Defendant regardless of the circumstances; any such reading plainly would not comport with the express terms of RCW 10.77.
A defendant who pleads not guilty by reason of insanity and is examined under RCW 10.77 has a statutory right to "refuse to answer any question if he ... believes his... answers may tend to incriminate him ... or form links leading to evidence of an incriminating nature." RCW 10.77.020(4); State v. Pawlyk, 115 Wash.2d at 467, 800 P.2d 338. The statutory privilege against self-incrimination is strictly construed and only applies to psychiatric evaluations of a defendant conducted under RCW 10.77, not in diminished capacity cases.
We take this opportunity to clarify further our holding in Hutchinson I, which requires a defendant who has claimed diminished capacity, and thereby placed his mental state at issue, to submit to an examination by the State's expert. The trial court must then determine the scope of the expert's testimony at trial, allowing opinions and observations which were not gleaned from incriminating statements. A statement should not be ruled incriminating merely because it tends to show the defendant was capable of forming the crime's requisite mental state. On the other hand, an expert should not be allowed to testify to a defendant's incriminating statements, e.g., confessions or admissions that he or she committed the crime charged. As the Court of Appeals pointed out in Hutchinson II, the trial court can only meaningfully address these issues after a defendant has fully participated in the examination.
This distinction will not always be easy to apply, but it balances the defendant's right to be free from self-incrimination with the State's interest in disclosure"the only effective means it has of controverting [a defendant's] proof on an issue that he interjected into the case." Estelle v. Smith, 451 U.S. 454, 465, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). To allow a defendant to refuse, at the outset, to answer any question on the grounds he may incriminate himself would render an examination useless; the trial court's power under CrR 4.7 to order such an examination would be meaningless. Hutchinson I does not allow a defendant asserting a diminished capacity defense to refuse to answer incriminating questions, and the Fifth Amendment does not bar an inquiry by the State's expert into a defendant's charged and uncharged offenses.
The question remains whether the Defendant failed to comply with the trial court's and this court's orders. It appears the parties and the trial court were initially confused as to how to apply our September 1988 order, which preceded our opinion in Hutchinson I and affirmed the requirement that the Defendant submit to an examination by the State's expert. It was during this period of time, on January 11, 1989, that the Defendant was ordered to be examined by Dr. Muscatel, refused, and was sanctioned with exclusion of his experts' testimony. Two days after those proceedings, we issued our opinion in Hutchinson I, which the trial court correctly read as requiring the Defendant to answer incriminating questions, but reposing in the trial court the ability to exclude answers to such questions at trial. The Defendant believed that during a compelled mental examination he had the right to refuse to answer any question if he believed his answers would incriminate him. And even after four defense motions to reconsider, during which the trial court patiently reiterated its reading of Hutchinson I and its correspondent ruling, the Defendant refused the ordered examination. We concede the lapse of time between our order and our written *1070 opinion in Hutchinson I left the parties and the court doubtful as to how to proceed. However, the trial court's rulings were clear following issuance of Hutchinson I. At the very least, they required the Defendant to submit to an examination by the State's expert. Yet the Defendant, believing the trial court was wrong, steadfastly refused to comply. We find he violated the trial court's orders.
The Defendant argues the trial court's exclusion of defense expert witness testimony regarding diminished capacity (except Dr. Halpern's testimony about the effects of alcohol) was improper under CrR 4.7(h)(7)(i), which provides:
[T]he court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.
State v. Glasper, 12 Wash.App. 36, 38, 527 P.2d 1127 (1974) was the first case to interpret the rule. The court in that case pointed out Washington's rule was adapted from Fed. R.Crim.P. 16(g), with one difference: the advisory committee omitted a clause allowing the court to "`prohibit the party from introducing in evidence the material not disclosed.' "Glasper, 12 Wash.App. at 39, 527 P.2d 1127 (quoting Wash. Proposed Rules of Crim. Proc., Rule 4.7, cmt. at 85 (West 1971)). Glasper therefore held CrR 4.7(h)(7)(i) does not allow the trial court to suppress evidence as a remedy for discovery violations, and Washington courts have consistently followed that holding. See, e.g., State v. Ray, 116 Wash.2d 531, 538, 806 P.2d 1220 (1991); State v. Laureano, 101 Wash.2d 745, 762, 682 P.2d 889 (1984), overruled by State v. Brown, 111 Wash.2d 124, 761 P.2d 588 (1988); State v. Thacker, 94 Wash.2d 276, 280, 616 P.2d 655 (1980).
While the Defendant objected to the trial court's exclusion of testimony, CrR 4.7 and the cases interpreting it were never cited or brought to the court's attention. The Defendant does not argue this is a constitutional issue which can be raised for the first time on appeal. In fact, exclusion does not violate the Sixth Amendment. Taylor v. Illinois, 484 U.S. 400, 412-13, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). The Defendant does not argue the state constitution provides greater protection. We nevertheless reach the issue, as the Court of Appeals opinion addressed it substantively.
We construe CrR 4.7 in light of the United States Supreme Court's decision in Taylor v. Illinois, which permits exclusion of defense witness testimony as a sanction for discovery violations. While CrR 4.7(h)(7)(i) does not enumerate exclusion as a remedy, it does allow a trial court to "enter such other order as it deems just under the circumstances." This language allows the trial court to impose sanctions not specifically listed in the rule. State v. Jones, 33 Wash.App. 865, 868, 658 P.2d 1262, review denied, 99 Wash.2d 1013 (1983). The State argues the rule should be read to encompass exclusion of evidence and applied narrowly to discovery violations such as this.
Cases interpreting CrR 4.7(h)(7)(i) have typically involved the failure to produce evidence or identify witnesses in a timely manner. See, e.g., State v. Linden, 89 Wash.App. 184, 947 P.2d 1284 (1997) (holding trial court acted within its discretion when granting continuance to defense for prosecution's late disclosure of information). Violations of that nature are appropriately remedied by continuing trial to give the nonviolating party time to interview a new witness or prepare to address new evidence. Where the State's violation of the rule is serious, mistrial or dismissal may be appropriate. See, e.g., Jones, 33 Wash.App. at 868-69, 658 P.2d 1262 (holding State's numerous failures to adhere to trial judge's discovery orders justified mistrial).
But where, as here, the discovery violation is the defendant's ongoing refusal to undergo a court-ordered examination, none of those remedies is meaningful. A continuance, as shown here, would serve no purpose unless the defendant who had refused to cooperate could be compelled to submit to an examination during the delay. Holding the defendant in contempt might result in compliance in some situations but would have little or no effect on a defendant charged with a capital *1071 crime, as here. Dismissal, obviously, would only unfairly penalize the State.
We also do not agree with Defendant's argument that the State's (and presumably the State's expert's) access to the Defendant's taped confession is a "remedy." First, a police interrogation in the midst of a double homicide investigation is obviously conducted for different reasons and would doubtless yield different information from that obtained in a court-ordered psychiatric examination. Second, and more important, is the fact an expert may not render an opinion regarding a defendant's mental state at the time of the crime unless the expert has personally examined the defendant. State v. Thamert, 45 Wash.App. 143, 147, 723 P.2d 1204, review denied, 107 Wash.2d 1014 (1986) (citing State v. Edmon, 28 Wash.App. 98, 102-03, 621 P.2d 1310, review denied, 95 Wash.2d 1019 (1981)).
The Court of Appeals notes an expert may testify that a defendant refused to be examined. A refusal, however, is not affirmative evidence of the defendant's mental state at the time of the crimean element which the State is required to prove beyond a reasonable doubt. And the Defendant is still rewarded with a one-sided presentation.
The Court of Appeals recognized that disallowing suppression as a remedy allows the jury to make a decision based on more, not less, relevant evidence. Again, however, that laudable policy only results here in a windfall to the Defendant, if he is allowed to present his expert testimony while refusing to be examined by the State's expert. A defendant simply has no incentive to comply with an order that he submit to an examination unless exclusion is a remedy.
Exclusion or suppression of evidence is an extraordinary remedy and should be applied narrowly. Discovery decisions based on CrR 4.7 are within the sound discretion of the trial court, State v. Yates, 111 Wash.2d 793, 797, 765 P.2d 291 (1988), and the factors to be considered in deciding whether to exclude evidence as a sanction are: (1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the prosecution will be surprised or prejudiced by the witness's testimony; and (4) whether the violation was willful or in bad faith. Taylor, 484 U.S. at 415 n. 19, 108 S.Ct. 646 (citing Fendler v. Goldsmith, 728 F.2d 1181, 1188-90 (9th Cir.1983)).
In this case, the factors weigh in favor of exclusion. Less severe sanctions, as we stated above, would not be effective. The impact of witness preclusion in this case was significant. Marsha Hedrick, a clinical psychologist, would have testified to the Defendant's history of abuse as a child, his paranoid schizophrenia, and his low IQ, concluding he was highly unlikely to have premeditated the action. Defense counsel made offers of proof that Dr. George Christian Harris, a psychiatrist, would have testified: "We are talking about major mental disorders here with major [e]ffects on the mental machinery.... I think you have substantial impairment of ability, or capability of formulating intent." Clerk's Papers at 309. Monty Scott, a neuropsychologist, would have expressed his "very strong opinion" that the Defendant was not "capable of premeditating the act of murder on that date[.]" Clerk's Papers at 313. Exclusion of the foregoing testimony was nevertheless ameliorated by the allowance of Dr. Halpern's and several lay witnesses' testimony regarding the Defendant's diminished capacity at the time of the crime.
Having been notified of the proposed witnesses' expected testimony, the State may not have been "surprised" at trial. It would, however, have been prejudiced by the inability to counter the testimony with any affirmative evidence.
Finally, the discovery violation was willful. As the trial court noted in denying one of the motions for reconsideration, the Defendant's "continual refusal" to undergo an examination was marked by repeated "defiance." Verbatim Report of Proceedings at 1479 (June 15, 1989). We hold exclusion of the Defendant's experts was warranted in this case.
The Defendant proposed a jury instruction that would have told the jury homicide is justifiable when *1072 the slayer reasonably believes that the person slain intends to commit a felony or to inflict death or great personal injury and reasonably believes that there is imminent danger of such harm being accomplished.
Clerk's Papers at 273. The trial court instead based its instruction on then-existing WPIC 16.02. Instruction 24 informed the jury:
Homicide is justifiable when committed in the lawful defense of the slayer when the slayer reasonably believes that the person slain intends to inflict death or great personal injury and there is imminent danger of such harm being accomplished.
Clerk's Papers at 123.
We recently held the pattern instruction is ambiguous and could lead the jury to believe there must actually be an imminent danger of harm, rather than a reasonable belief that such danger exists. State v. LeFaber, 128 Wash.2d 896, 902-03, 913 P.2d 369 (1996). The Court of Appeals held the trial court's erroneous instruction in this case was presumptively prejudicial, and the State had not rebutted the presumption.
Unlike LeFaber, however, the trial court gave an additional instruction which clarified any ambiguity created by instruction 24. The instruction was proposed by the Defendant and based upon then-existing WPIC 16.07. Instruction 30 informed the jury:
If a person acting as a reasonably prudent person mistakenly believes himself to be in danger of injury or of an offense being committed against him, he has the right to defend himself by the use of lawful force against that apparent injury or offense even if he is not actually in such danger.

Clerk's Papers at 129 (emphasis added).
Instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law. Flint v. Hart, 82 Wash.App. 209, 223, 917 P.2d 590 (1996). The jury is presumed to read the court's instructions as a whole, in light of all other instructions. The jury is also to presume each instruction has meaning. State v. McLoyd, 87 Wash.App. 66, 71, 939 P.2d 1255 (1997), review granted, 134 Wash.2d 1010, 954 P.2d 276 (1998).
Read together, instructions 24 and 30 adequately conveyed the law of self-defense to the jury in this case. While instruction 24 could have been interpreted to require actual imminent danger, instruction 30 explicitly informed the jury the Defendant was entitled to act on appearances and the actual danger was not required. McLoyd, 87 Wash.App. at 71, 939 P.2d 1255. Accordingly, we hold the instructions, taken in their entirety, properly stated the law.
The Defendant also argues the trial court erred in admitting his confession. The Court of Appeals found the Defendant's confession was properly admitted as voluntary and given after a knowing and intelligent waiver. The Defendant makes no additional argument to this court, and, indeed, the Court of Appeals was correct in affirming the trial court's allowance of Defendant's confession at trial.
The State established that the Defendant knowingly and intelligently waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). The Defendant argued his intoxication, sleep deprivation, and low IQ rendered his waiver involuntary because it was neither knowing nor intelligent. However, the Defendant had been advised of his rights at least five separate times in recent years. Each time, he acknowledged understanding those rights, waived them, and spoke to police.
Moreover, nobody who came into contact with the Defendant on the morning of his arrest observed him to have any difficulty walking or talking, and he did not appear at that point to be intoxicated. The trial court properly relied on eyewitness testimony of the Defendant's ability to function and found he knowingly, intelligently, and voluntarily waived his rights to remain silent and to have counsel present when talking to police.
The Defendant also claims the trial court erroneously limited defense testimony *1073 regarding the victims' character. The Court of Appeals declined to address this issue. Defendant's argument in the court below was that he should have been allowed to put on testimony that Deputy Heffernan had a history of verbally abusing people he confronted professionally, and physically abusing suspects he stopped for driving while under the influence. The trial court did permit the Defendant to introduce the testimony of specific witnesses who could testify to the general reputation of Deputy Heffernan for a pertinent, relevant character trait.
The trial court's holding was correct. Evidence of a person's character is generally not admissible to show action in conformity therewith on a particular occasion. ER 404(a). In criminal cases, a defendant may introduce evidence of the victim's violent disposition to prove the victim acted in a violent manner at the time of the crime. ER 404(a)(2); State v. Alexander, 52 Wash.App. 897, 900, 765 P.2d 321 (1988). The trial court properly excluded several witnesses who would have testified only that Deputy Heffernan was intimidating, or rude, and those witnesses who would have testified only to the reputation of the Island County Sheriff's Department.
The remaining witnesses would have testified about specific acts allegedly committed by Deputy Heffernan, which the Defendant characterized as violent. The trial court correctly excluded these witnesses' testimony because evidence of a character traithere, Deputy Heffernan's allegedly violent dispositionmust be in the form of reputation evidence, not evidence of specific acts. ER 404(a)(2); ER 405(a). Specific acts may be used to prove character only where the pertinent character trait is an essential element of a claim or defense. ER 405(b). Specific act character evidence relating to the victim's alleged propensity for violence is not an essential element of self-defense.
In Alexander, 52 Wash.App. 897, 765 P.2d 321, the defendant, who was charged with assault in the second degree, relied on self-defense and attempted to introduce prior specific acts of the victim to prove the victim was the aggressor. The trial court excluded the evidence. The Court of Appeals affirmed, holding the victim's character trait of violence was not an essential element of a self-defense claim: "The self-defense issue could be resolved without any evidence of, or reliance upon, a character trait of [the victim] or the defendant." Alexander, 52 Wash.App. at 901, 765 P.2d 321. Proof, or failure of proof of the character trait, standing alone, would not satisfy any element of the charge, claim, or defense. It was therefore not essential and the evidence was properly limited to opinion or reputation.
Likewise, in this case, the Defendant's claim of self-defense was not dependent upon his being able to show Deputy Heffernan had a propensity toward violence. Although relevant, Deputy Heffernan's character was not an essential element of the defense, and evidence of it was properly limited to testimony regarding reputation.
Finally, the Defendant argues his shackling at the ankle during trial violated his Sixth and Fourteenth Amendment rights to a fair trial. Generally, a defendant has the right to appear before the jury free of shackles or other restraints. Wilson v. McCarthy, 770 F.2d 1482, 1484 (9th Cir. 1985). A defendant's appearance in shackles "may reverse the presumption of innocence by causing jury prejudice[,]" thereby denying him due process. Jones v. Meyer, 899 F.2d 883, 885 (9th Cir.), cert. denied, 498 U.S. 832, 111 S.Ct. 95, 112 L.Ed.2d 67 (1990). However, the trial court has broad discretion in making this determination. State v. Breedlove, 79 Wash.App. 101, 113-14, 900 P.2d 586 (1995). We have listed several factors to be addressed when deciding whether a defendant should be restrained during trial:
[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of *1074 the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.
State v. Hartzog, 96 Wash.2d 383, 400, 635 P.2d 694 (1981) (quoting State v. Hartzog, 26 Wash.App. 576, 588, 615 P.2d 480 (1980)).
The trial court conducted a hearing on the defense motion to appear without restraints, but did not address the Hartzog factors, instead taking into account only the physical layout of the courthouse and courtroom and considering several types of restraints. It appears the trial court exercised its discretion with respect to the types of restraints the Defendant would wear, but not with respect to whether he should wear them at all.
Arguably, the trial court addressed only one factorthe nature and physical security of the courtroomand therefore erred in not considering the remaining factors. However, the method of restraint selected prevented the jury from seeing that the Defendant was restrained. Indeed, the trial record contains no evidence that the jurors saw the Defendant in restraints. The trial judge assured himself the restraints were not visible to the jury.
A claim of unconstitutional shackling is subject to harmless error analysis. In order to succeed on his claim, the Defendant must show the shackling had a substantial or injurious effect or influence on the jury's verdict. Because the jury never saw the Defendant in shackles, he cannot show prejudice. Rhoden v. Rowland, 10 F.3d 1457, 1459-60 (9th Cir.1993). The Defendant does not argue persuasively that he was prejudiced in any way by the unseen restraints. Accordingly, we hold any error was harmless. See United States v. Collins, 109 F.3d 1413, 1418 (9th Cir.), cert. denied, ___ U.S. ___, 118 S.Ct. 183, 139 L.Ed.2d 123 (1997).
The Defendant's convictions are affirmed.
DURHAM, C.J., and SMITH, GUY, ALEXANDER and TALMADGE, JJ., concur.
MADSEN, Justice, dissenting.
I respectfully dissent. The majority affirms the defendant's convictions for two counts of aggravated murder and upholds the trial court's discovery sanctions excluding the defendant's evidence regarding his claim of diminished capacity. In doing so, the majority overlooks the ambiguity of this court's interlocutory order and the vague contradictory language in State v. Hutchinson, 111 Wash.2d 872, 766 P.2d 447 (1989) (Hutchinson I), which the defendant reasonably understood to mean that he could refuse to answer questions by the state's expert if he believed the answers might incriminate him. Moreover, the majority holds that a criminal defendant who does not comply with discovery requests may be sanctioned by exclusion or suppression of evidence. Although the majority recognizes that such a holding contradicts the practice that Washington courts have traditionally followed, it nevertheless justifies this departure by speculating that no other meaningful remedy was available. I dissent because neither the circumstances nor precedent warrant exclusion of evidence.
The defendant did not violate this court's order because the language in both our first order and Hutchinson I support the defendant's reading. Indeed, the majority concedes that both parties were confused by the September 26, 1988 order, as to how the defendant's right against self-incrimination would be protected during a compelled examination. The order stated: "[N]either the interposing of a diminished capacity defense by Mr. Hutchinson nor his submission to this examination shall be deemed to waive his constitutional right against self-incrimination[.]" Hutchinson I, 111 Wash.2d at 874, 766 P.2d 447. In an effort to clarify that order, this court issued Hutchinson I. Unfortunately, Hutchinson I still contained language that defendant was reasonably entitled to believe meant that he did not have to submit to the State's expert examination: "The defendant, upon such an examination, may refuse to answer any question if he believes his answer might tend to incriminate him or lead to evidence of an incriminating nature." Id. at 884, 766 P.2d 447 (citing RCW 10.77.020(4)).[1] As a result, the defendant *1075 genuinely and reasonably believed he was not required to answer questions by the State's expert[2] and even the trial court justifiably expressed frustration in interpreting Hutchinson I. See Clerk's Papers at 1297-98; Verbatim Report of Proceedings (RP) (Jan. 11, 1989) at 16-21. To make matters worse, just two days prior to our opinion in Hutchinson I, the State's expert exacerbated the confusion at the outset of the defendant's examination, stating "whatever you say does not have Fifth Amendment privileges." RP (Jan. 11, 1989) at 2. This warning by the State's expert gave defendant further reasonable cause for concern that his answers during the compelled examination might incriminate him. In light of such confusion and the ambiguity in Hutchinson I, this court should hold that defendant did not violate this court's order.
Even if the defendant violated the order as "clarified" in Hutchinson I, exclusion or suppression of evidence is not a valid sanction for such a violation of discovery rules.[3] The majority clearly recognizes that Washington courts have consistently applied CrR 4.7(h)(7)(i) as not encompassing exclusion or suppression of evidence since its inception in State v. Glasper, 12 Wash.App. 36, 38, 527 P.2d 1127 (1974). Since then, as the majority points out, we have uncompromisingly reiterated this rule in several cases. See State v. Thacker, 94 Wash.2d 276, 280, 616 P.2d 655 (1980) (reversing conviction and holding that suppression of evidence is not one of the sanctions available for failure to comply with the discovery rules); State v. Laureano, 101 Wash.2d 745, 762, 682 P.2d 889 (1984) ("Failure to comply with CrR 4.7 may result in an order compelling discovery, a continuance, or dismissal of the action. CrR 4.7(h)(7)(i). Suppression of evidence is not one of the sanctions available for failure to comply with the discovery rules."); State v. Terrovona, 105 Wash.2d 632, 651, 716 P.2d 295 (1986) ("[S]uppression of evidence is not one of the sanctions available."); State v. Ray, 116 Wash.2d 531, 538, 806 P.2d 1220 (1991) ("Suppression of evidence is not one of the sanctions available for failure to comply with discovery rules and the trial court, therefore, erred when it suppressed [defense] testimony because the court believed Ray violated CrR 4.7(b).") (citing State v. Thacker, 94 Wash.2d 276, 280, 616 P.2d 655 (1980)).
Washington law has unequivocally held that sanctions for noncompliance with discovery rules do not include exclusion of evidence. Nevertheless, the majority relies on a United States Supreme Court ruling in Taylor v. Illinois, 484 U.S. 400, 414-15, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), in which exclusion of evidence as a discovery sanction was permitted where the defendant did not disclose or identify key witnesses. In Taylor, the high court noted where such an omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, exclusion of defense witness' testimony was proper. Taylor, 484 U.S. at 415, 108 S.Ct. 646. Unlike Taylor, however, in this case defendant's alleged noncompliance with discovery rules was not willful nor motivated by tactical advantage. Rather, defendant's nonparticipation in the State's expert examination was due to the confusing language in our interlocutory order and opinion in Hutchinson I. Moreover, even after Taylor was decided, this court has reaffirmed Washington's rule that suppression of evidence is not a valid discovery sanction. Ray, 116 *1076 Wash.2d at 538, 806 P.2d 1220. There is no compelling reason to change course now.
Although suppression of evidence is not within the scope of discovery sanctions, a trial court may consider other remedies, such as a continuance, contempt, a fine, or dismissal for a party's noncompliance with discovery rules. Here, however, the trial court did not consider the imposition of other less restrictive sanctions, but rather in an attempt to "get the attention of the Supreme Court" granted the State's motion to exclude defense experts. RP (Jan. 11, 1989) at 37-38, 49, 69-72. Even after Hutchinson I and the defendant's subsequent motions to reconsider exclusion of defense experts, the trial court failed to consider imposing other less onerous sanctions for the defendant's nonparticipation in the State's expert examination.
As alluded to above, there is considerable doubt, about whether the trial court intended exclusion to be the final result, or only to serve as a vehicle to bring to this court's attention the problem engendered by this court's order and subsequent opinion in Hutchinson I. The majority believes that the trial court's sanction was proper because no other remedy would have been meaningful. This reasoning is not convincing in light of the totality of circumstances. Because the trial court did not even consider imposing any other sanction, the effect of other less restrictive remedies is unknown.[4]
The majority, overruling precedent from this court, broadens the discretionary power of the trial court under CrR 4.7(h)(7)(i) by holding that exclusion of evidence could be a possible sanction a trial court may "deem just under the circumstances." CrR 4.7(h)(7)(i). I respectfully submit that suppression under the circumstances of this case is not just. Here, the impact of defendant's nonparticipation in the State's expert examination pales in comparison to the impact on defendant, who was effectively prevented from asserting his only defense, diminished capacity.
The Court of Appeals pointed out that although the sanction rule preempts evidentiary exclusion, other rules compensate by allowing relatively intrusive discovery. State v. Hutchinson (Hutchinson II), 85 Wash. App. 726, 738, 938 P.2d 336 (1997) (citing State v. Gonzalez, 110 Wash.2d 738, 745, 757 P.2d 925 (1988)). In weighing the risk of surprise to the State and the availability of defendant's diminished capacity evidence, the Court of Appeals correctly concluded that Washington rules afford the prosecution sufficient opportunity to rebut a defendant's diminished capacity claim,[5] even if the defendant violates the court's order to participate in a mental health examination. Hutchinson II, 85 Wash.App. at 738, 938 P.2d 336. Thus, defendant's nonparticipation in the State's expert examination did not warrant exclusion of evidence given alternative sanctions, other means to compel discovery of defendant's diminished capacity claim, and the severe impact of exclusion.
Given the ambiguity and confusion surrounding this court's directive and Hutchinson I, the well-established case law precluding exclusion and suppression of evidence as a sanction for discovery violations, and the fact that exclusion of the evidence in this *1077 case was tantamount to depriving the defendant of his only defense, this court should conclude that the trial court improperly excluded the defendant's evidence regarding his claim of diminished capacity.
SANDERS and JOHNSON, JJ., concur.
NOTES
[1] In State v. Lopez, 74 Wash.App. 456, 459, 874 P.2d 179 (1994), the Court of Appeals specifically cited this language from Hutchinson I to determine whether a psychiatric report could be used to impeach a defendant.
[2] That defendant genuinely believed he was not required to answer questions by the State's expert is further supported by the fact that even the Supreme Court Commissioner suggested to defense counsel to seek reconsideration of the trial court's orders regarding mental examination in light of Hutchinson I. Clerk's Papers at 1297; Verbatim Report of Proceedings (Jan. 11, 1989) at 16-19.
[3] CrR 4.7(h)(7)(i) plainly states: "if at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances."
[4] Cf. In re Firestorm, 129 Wash.2d 130, 916 P.2d 411 (1996) (Disqualification of counsel as a sanction for violating CR 26(b)(5) was too extreme and disproportionate to the rule violation; the trial court should have considered less severe sanctions.) "The record in this case does not allow us to determine what other sanctions for the violation in this case would comport with Fisons. `What the sanctions should be and against whom they should be imposed is a question that cannot be fairly answered without further factual inquiry, and that is the trial court's function.'" Id. at 145, 916 P.2d 411 (quoting Washington State Physicians Ins. Exch. Ass'n v. Fisons Corp., 122 Wash.2d 299, 355, 858 P.2d 1054 (1993)).
[5] CrR 4.6(a) requires witnesses to discuss the case with both sides. Alternately, the court can order witnesses deposed. CrR 4.6(a); see also State v. Glasper, 12 Wash.App. 36, 39, 527 P.2d 1127 (1974). The court can compel discovery of testifying, consulting, and failed experts, including their reports, notes, and test data. State v. Pawlyk, 115 Wash.2d 457, 467, 800 P.2d 338 (1990); State v. Hamlet, 83 Wash.App. 350, 358, 921 P.2d 560 (1996). The State's expert may relate the defendant's refusal to be examined when explaining the bases of the expert's opinion State v. Huson, 73 Wash.2d 660, 667, 440 P.2d 192 (1968); Louisiana v. Widenhouse, 582 So.2d 1374, 1384 (La.App.1991).