

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34332-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DERRICK LYNN BARRETT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. —Derrick Barrett appeals his convictions for three counts of second degree rape, and one count each of unlawful imprisonment and fourth degree assault, all of which were pleaded and proved to be domestic violence offenses. He contends the trial court abused its discretion when it imposed the extraordinary sanction of excluding two late-disclosed witnesses and that it miscalculated his offender score. We find no error or abuse of discretion. For that reason, and because there is no merit to Mr. Barrett's statement of additional grounds, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In late August 2014, an intoxicated Derrick Barrett persuaded his former girlfriend, K.M., a bartender at the Tonasket Eagles Aerie bar, to drive him home after she got off work, and proceeded at his home to take her captive and commit an extended

sexual assault. He was charged with three counts of rape in the second degree and one

count of unlawful imprisonment, both involving K.M. He was charged with one count of

fourth degree assault involving his roommate, Taylor Pillow, whom he tried to strike

during the course of K.M.'s captivity, when Mr. Pillow got between Mr. Barrett and

K.M. The State charged all the counts as domestic violence crimes.

Mr. Barrett's original trial date was set for December 2, 2014. Trial was

continued repeatedly, mostly at the request of Mr. Barrett's trial counsel. Until the case

became one of the county's oldest, there were few objections by the State. The State did

object to one of the last continuances, requested on September 8, 2015, explaining that

the date had been set to accommodate the schedule of Mr. Barrett's lawyer, John

Crowley. Trial was set to begin the following day, and then-deputy prosecutor Brendan

Platter told the court that his estimated 16 witnesses were subpoenaed and coordinated to

appear. Because Mr. Crowley was trying a case in another county, trial was continued

over Mr. Platter's objection.

On December 21, 2015, both lawyers stated they would be ready for trial the first

week of January 2016; the date was later changed to the second week of January. At the

readiness hearing on January 4, 2016, Mr. Crowley had sent substitute counsel to appear

for Mr. Barrett, as he had many times before. In confirming the January 12 trial date, the

trial court told substitute counsel that Mr. Crowley needed to be present the following

Monday, stating that Mr. Barrett's prosecution "needs to be done." Report of Proceedings (RP)[1] at 72. Over 16 months had passed since the date of the crime.

On the same day the court cautioned substitute counsel about needing to get the case tried, Mr. Crowley and Mr. Platter spoke by phone, and Mr. Crowley disclosed that he had learned of two previously undisclosed witnesses. Mr. Platter asked for the witnesses' names. Mr. Crowley said he did not want to provide names because he didn't know if he was going to call the witnesses or not.

The next Mr. Platter heard about the witnesses was on Sunday afternoon, January 10. When Mr. Crowley telephoned Mr. Platter he was at work, preparing for trial. Mr. Platter claims he was told the following about the witnesses, whom Mr. Crowley identified as "'Wendy something,'" and "'David Barrow'":

> Wendy would testify that the day or so after the incident of this case, Mr. Barrow and the victim were in the victim's bedroom. The victim came out punching herself in the thigh. Wendy asked what she was doing and the victim replied "these bruises are not convincing enough but they will be." The State was told Mr. Barrow would testify to something similar.

Clerk's Papers (CP) at 220-21.

Mr. Platter told Mr. Crowley he wanted a written summary of the witnesses' testimony and phone numbers for both. As of the night before trial, Mr. Platter had not

---

[1] All references to the report of proceedings are to the consecutively-paginated volumes that begin with proceedings on September 2, 2014, and include the January 2016 trial.

received the full names of the witnesses, any written summary of their anticipated testimony, or any contact information for them. He arrived in court on the morning of trial with his motions in limine, to which he had added a motion asking that the two witnesses be excluded. Mr. Crowley arrived in court that morning with a corrected name, David "Barton," and incomplete contact information.

Both lawyers were familiar with and argued the factors considered when a trial court decides whether to exclude evidence as a sanction. Identified by our Supreme Court in *State v. Hutchinson*, 135 Wn.2d 863, 883, 959 P.2d 1061 (1998), *aff'd*, 147 Wn.2d 197, 53 P.3d 17 (2002), the factors are "(1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the prosecution will be surprised or prejudiced by the witness's testimony; and (4) whether the violation was willful or in bad faith."

Mr. Crowley told the trial court he had acted with due diligence, but that it had only been "about . . . a week ago that I first heard from a source that I may find favorable witnesses." RP at 89. He did not identify his source. He said that he had kept his client apprised of the situation, including telling his client that "of course, I can't disclose witnesses who I haven't spoken to yet." RP at 90.

When the trial court seemed inclined to exclude one or more of the witnesses, Mr. Crowley pressed the issue of why a less severe sanction such as a continuance of trial would not suffice, stating, "Mr. Barrett's willing to waive speedy trial." RP at 101. He

4

also pointed out that under the rules of evidence, the testimony of his proposed witnesses could be offered only if and after K.M. was asked about her ostensible statement about bruising herself and denied it. *See* ER 613(b). He argued that the State would have time to interview his witnesses before the defense case.

Mr. Platter cited several reasons why a less severe sanction would not work. He pointed out how long the case had been pending, and contended he could not put the victim through another continuance of a prosecution that "is straining on her." RP at 93. He intended to call 14 witnesses, some from out of town, and told the court that coordinating them had been extremely difficult. He argued that because Mr. Barrett's witnesses' evidence dealt with an event alleged to have occurred after the crimes, it did not bear on whether he committed the crimes.

After hearing argument, the trial court orally weighed the *Hutchinson* factors. It found the State would be surprised and prejudiced by the testimony. It declined to make a finding on willfulness or bad faith, stating, "I just don't know the circumstances—how this disclosure came about." RP at 96-97. Because the evidence did not bear on whether crimes had occurred, but on K.M.'s claimed wish to make her bruises "more convincing," it found the impact on the evidence to be of reduced significance. It accepted Mr. Platter's arguments as to why a lesser sanction would not suffice.

At trial, after jury selection and opening statement, Mr. Platter took about a day and a half to present the testimony of 11 state witnesses. K.M. described three acts of

rape occurring during a period of captivity that began when she arrived at Mr. Barrett's home. The first act of rape took place outside on the gravel driveway. The other two took place in quick succession after Mr. Barrett forced her into his home. In cross-examining K.M., Mr. Crowley never asked her about self-bruising or about the statement attributed to her by his two excluded witnesses.

One of the State's witnesses, Jennifer Barge-Peck, was a neighbor of Mr. Barrett's who heard K.M. screaming at the beginning of the assault and drove to Mr. Barrett's home in an effort to see if she could help whoever was being attacked. She witnessed K.M. run toward and enter her truck, only to have Mr. Barrett say to Ms. Barge-Peck, "[M]ind your own, bitch," and pull K.M. out of the truck. RP at 339. Ms. Barge-Peck testified that K.M. pleaded, "[D]on't leave, don't leave," to which Ms. Barge-Peck answered that she had "to go get help." RP at 341. At a nearby gas station, she saw sheriff's vehicles and told deputies where she had seen a woman who was in trouble.

Of the State's witnesses, three were deputies who traveled to Mr. Barrett's home in response to Ms. Barge-Peck's report. One of the first to arrive saw K.M. screaming "help" and "running probably as fast as she could" from Mr. Barrett, who was chasing her. RP at 139, 141. Another testified, "I've been doing this a long time and I don't think I've ever seen anybody that scared." RP at 345. Upon seeing the officers, Mr. Barrett turned and ran back toward his home, ignored the officers' commands that he stop, and locked himself inside.

The State also called Mr. Pillow, Mr. Barrett's roommate. He testified that he had been awakened by the sound of Mr. Barrett and K.M. fighting and had believed both were intoxicated. He said he didn't recall K.M. being "too distraught." RP at 312. But he confirmed many aspects of K.M.'s testimony, including that she had asked him for help, that she ran away from Mr. Barrett when she had the chance, and that after running, she had been "herded" or carried back into the home by Mr. Barrett. RP at 329. He also testified that Mr. Barrett had swung at him. All told, six of the State's witnesses—Ms. Barge-Peck, Mr. Pillow, three sheriff's deputies, and an emergency room nurse—saw K.M. during or shortly after the period she was being held captive.

Mr. Barrett was the only defense witness. According to him, after he and K.M. left the Eagles bar, they had consensual sexual intercourse in her car in a parking lot. He admitted that the two then had a heated argument in his driveway, that he pulled K.M. out of the neighbor's truck, and that the pair continued to fight inside Mr. Barrett's home.

The jury found Mr. Barrett guilty as charged.

At sentencing, the lawyers disagreed about whether the unlawful imprisonment conviction counted as two points in arriving at the offender score for the remaining convictions. Mr. Platter believed that it did, leading to an offender score of 7; Mr. Crowley disagreed, arguing for an offender score of 6.

The trial court agreed with the State, and with an offender score of 7, the standard range for the rape counts was 159 to 211 months. The trial court sentenced Mr. Barrett to

7

a minimum term of 170 months for each of the three second degree rape convictions, all to run concurrent with the shorter sentences for the fourth degree assault and unlawful imprisonment convictions. Mr. Barrett appeals.

## ANALYSIS

Mr. Barrett contends the trial court abused its discretion when it excluded the testimony of Wendy Pillow[2] and Mr. Barton. He renews Mr. Crowley's challenge to the offender score. We address the assignments of error in that order.

I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING THE TESTIMONY OF MS. PILLOW AND MR. BARTON

The criminal discovery rule requires a defendant to disclose witness information within his or her control by no later than the omnibus hearing. CrR 4.7(b)(1). The witness information required to be disclosed is the witnesses' names, addresses, and the substance of their testimony, together with any written or recorded statements. The rule imposes a continuing duty to "promptly" disclose like information coming within the defendant's control thereafter. CrR 4.7(h)(2).

If it is brought to the attention of the court that a party has failed to comply with discovery requirements, the discovery rule authorizes the court to order the offending party "to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the

---

[2] Wendy Pillow is the mother of Taylor Pillow.

circumstances". CrR 4.7(h)(7)(i). Our Supreme Court has construed the rule to authorize a trial court to exclude late-disclosed evidence. "Exclusion or suppression of evidence is an extraordinary remedy and should be applied narrowly," however. *Hutchinson*, 135 Wn.2d at 882. "The appropriate remedy for late disclosure is typically to continue the trial to give the other party time to interview the new witness and prepare to address his or her testimony." *State v. Kipp*, 171 Wn. App. 14, 31, 286 P.3d 68 (2012), *rev'd on other grounds by* 179 Wn.2d 718, 317 P.3d 1029 (2014).

We have never held that the existence of a sanction less severe than excluding evidence trumps the other three *Hutchinson* factors. All four factors are important. In *Kipp*, for instance, the trial court found that a continuance of a half day would be effective yet still excluded the evidence.

We review a trial court's sanction ruling for abuse of discretion. *State v. Linden*, 89 Wn. App. 184, 189-90, 947 P.2d 1284 (1997). The trial court abuses its discretion when its decision is based on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Mr. Barrett makes three arguments why the exclusion of Ms. Pillow and Mr. Barton was reversible error. He argues, first, that there was no discovery violation because Mr. Crowley disclosed the existence of the witnesses as soon as he learned of them. Like the trial court, we will accept Mr. Crowley's representation that he first

learned of the witnesses' existence on January 4.[3]  But he did not provide Mr. Platter with the notification on January 4 that CrR 4.7(h)(2) requires.  We construe the rule to require notification that is meaningful under the circumstances.  Notification a week before trial that one might have two new witnesses without providing the witnesses' names or any indication of what they will testify to is of no use whatsoever.

Waiting to disclose a witness's name until a lawyer decides to call the witness is reasonable when plenty of time remains before trial.  Refusing to disclose the names of Ms. Pillow and Mr. Barton on January 4 because Mr. Crowley had not decided whether to call them was not reasonable.  It meant that of the precious seven days for investigation remaining before trial, Mr. Crowley kept seven for himself, leaving none for Mr. Platter.  The closer the parties are to trial, the more important it is that notification be as immediate and as complete as reasonably possible.  The trial court did not abuse its discretion in finding a violation of the duty of prompt notification.

Mr. Barrett next argues that Mr. Crowley's suggestion that the trial court could "grant the state leave to interview [the witnesses] over the telephone, either later that day or the next day . . . would have satisfied the state's concerns."  Appellant's Opening Br. at 11.  It would not have.  As Mr. Platter pointed out, by the time he got the information,

---

[3] Mr. Barrett's statement of additional grounds (SAG) appears to contend otherwise, but it is vague on this score.  *See* SAG at 2.

he was in trial, single-handedly putting on what was essentially a day and a half State case with 11 witnesses. The record reflects that although he had subpoenaed his witnesses, some were not responding to contacts or appearing as promised, and he had to prepare a motion for a material witness warrant during trial. Even if Mr. Platter could find time in the thick of these events to telephone Ms. Pillow and Mr. Barton and speak to them (something it took Mr. Crowley a week to do), Mr. Platter legitimately complained, "I don't have time to go find impeachment evidence or rebuttal witnesses or anything like that." RP at 89. The trial court did not abuse its discretion in finding surprise and prejudice.

Mr. Barrett's third argument is that excluding the witnesses violated his constitutional right to call witnesses on his own behalf. But the United States and Washington Supreme Courts have held otherwise: both the federal and state constitutions permit the exclusion of defense witness testimony as a sanction for discovery violations. *Hutchinson*, 135 Wn.2d at 881 (discussing *Taylor v. Illinois*, 484 U.S. 400, 412-13, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)).

We find no abuse of discretion in the trial court's exclusion of Ms. Pillow and Mr. Barton as witnesses.

The State argues in the alternative that if there was an abuse of discretion, it was harmless. The nonconstitutional harmless error standard applies, under which we will find error only if within reasonable probabilities, had Mr. Barrett been permitted to call

11

Ms. Pillow and Mr. Barton, "the outcome of the trial would have been materially affected." *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

Before Ms. Pillow or Mr. Barton could testify, K.M. would first have to be afforded the opportunity to explain or deny her alleged statement about self-bruising. *See* ER 613(b). At most, Ms. Pillow's and Mr. Barton's testimony would have established that K.M. stated she wanted her bruises to be "*more* convincing"—her statement did not imply that her report of the rapes was false. The nurse who performed the sexual assault examination of K.M. on the morning of the rapes testified that even that morning, K.M. had "a two by two purple bruise on the left lateral spine . . . [a]nd the right upper inner thigh [had] a three by three dark purple bruise." RP at 250. Those were in addition to abrasions on K.M. on "both elbows . . . [b]oth knees, the tops of her feet, hands, [and] her back." *Id.* Her clothing was dirty and torn, consistent with her testimony about initially being overpowered and raped by Mr. Barrett on the gravel driveway.

The six witnesses who saw K.M. during and in a short time after the alleged rapes were supportive of her testimony. This included even Mr. Pillow, whose testimony was substantially consistent with K.M.'s account, other than his assumption that she was intoxicated. (No other witness, apart from Mr. Barrett, testified that K.M. had been drinking or appeared to be intoxicated). We find no reasonable probability that the

proposed testimony of Ms. Pillow and Mr. Barton would have materially affected the outcome of the trial.

II.     THE TRIAL COURT CORRECTLY ARRIVED AT AN OFFENDER SCORE OF SEVEN FOR THE RAPES

Mr. Barrett's second assignment of error turns on the meaning of RCW 9.94A.525(21). Construction of a statute is a question of law we review de novo. *State v. Williams*, 171 Wn.2d 474, 476, 251 P.3d 877 (2011).

The 22 subsections of RCW 9.94A.525 provide rules for counting points to arrive at an offender score. Subsection (21) of the statute is a rule for counting points when a present conviction is "for a felony domestic violence offense where domestic violence as defined in RCW 9.94A.030 was pleaded and proven." It applied in counting points for Mr. Barrett's convictions in this case. The language of subsection (21) whose meaning the parties dispute states:

> . . . [C]ount priors as in subsections (7) through (20) of this section; however, count points as follows:
>
>      (a) Count two points for each adult prior conviction where domestic violence as defined in RCW 9.94A.030 was pleaded and proven after August 1, 2011, for the following offenses: . . . unlawful imprisonment [RCW 9A.40.040], . . .

RCW 9.94A.525(21)(a). The dispute is over whether Mr. Barrett's conviction in this case for unlawful imprisonment is a "prior conviction" to which the double counting applies.

The State points to RCW 9.94A.589(1)(a), which provides, "All other current and prior convictions" shall be scored "as if they were prior convictions for the purpose of the offender score." Mr. Barrett points to RCW 9.94A.525(1), which states, "A prior conviction is a conviction which exists before the date of sentencing for the offense for which the offender score is being computed." But RCW 9.94A.525(1) goes on to state, "Convictions entered or sentenced on the same date as the conviction for which the offender score is being computed shall be deemed 'other current offenses' within the meaning of RCW 9.94A.589."

The construction of "prior conviction" in the predecessor point counting provision of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, was settled long ago. In a book on Washington sentencing practices published in 1985, David Boerner observed that the SRA was silent on the scoring of "other current convictions" and interpreted the silence as an indication they should be scored as if they were prior convictions. DAVID BOERNER, SENTENCING IN WASHINGTON: A LEGAL ANALYSIS OF THE SENTENCING REFORM ACT OF 1981 5-16 (1985). Our Supreme Court embraced Mr. Boerner's interpretation in *State v. Jones*, 110 Wn.2d 74, 81, 750 P.2d 620 (1988), noting that the legislature had amended former RCW 9.94A.400(1)(a) (1984) in 1986 to include the language about "'using all other current and prior convictions as if they were prior convictions'" that presently appears in RCW 9.94A.589(1)(a). *Id.* at 82. The same

14

reasoning was applied to a point-counting rule in *State v. Redd*, 51 Wn. App. 597, 612, 754 P.2d 1041 (1988).

Under this long-standing case law, the trial court properly calculated Mr. Barrett's offender score for the domestic violence crimes other than unlawful imprisonment by double-counting his current conviction for unlawful imprisonment.

### STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Barrett raises two.

*Ineffective assistance of counsel.* Mr. Barrett first argues that his trial counsel was ineffective for failing to give Mr. Barrett an itemized statement of expenditures, sending substitute counsel to court appearances, neglecting discovery obligations, showing up at court too late to confer with Mr. Barrett, and failing to timely interview witnesses who could have proved helpful in his defense. While he generally describes the complained-of conduct, he fails to provide specifics or to support his conclusory allegations with evidence.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must demonstrate that a lawyer's representation was deficient and that the deficient representation prejudiced him. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Often, as is the case here, evidence required to support a

15

defendant's claim of deficient representation and prejudice is outside the record on appeal. In such cases the defendant's remedy, if he has evidence to support the claim, is to file a personal restraint petition with the supporting evidence. Mr. Barrett's conclusory SAG does not demonstrate the required deficient performance and prejudice.

*Prosecutorial misconduct.* Mr. Barrett's second additional ground for appeal is that the prosecutor committed prosecutorial misconduct. He contends, first, that the prosecutor failed to correct false testimony. While it is misconduct for any lawyer to suborn perjury, Mr. Barrett does not cite any legal authority that imposes a duty on prosecutors to correct false testimony. He does not explain how a prosecutor—unless he or she *was* suborning perjury—could even know whether a particular witness's testimony was false. No misconduct is shown.

He next contends that the prosecutor failed to produce information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Under *Brady*, the prosecution has an affirmative duty to disclose evidence that is favorable to a defendant. *Id.* at 87; *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). "In order to establish a *Brady* violation, a defendant must establish three things: (1) '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'th[e] evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) the evidence must be material."

*State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

Mr. Barrett does not identify the particulars of the alleged *Brady* violation. He does attach police reports of an incident in which K.M. reported her vehicle stolen, later admitting that it was a false report. His SAG does not demonstrate that he and his lawyer were unaware of the incident and that the State suppressed it. Here, again, his remedy, if he can prove the elements of a *Brady* violation, is to present the evidence in a personal restraint petition.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Korsmo, J.