IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77149-3-I |
| Respondent, | ) ) | |
| v. | ) ) | DIVISION ONE |
| JASON AARON BECKTEL, | ) ) | UNPUBLISHED OPINION |
| Appellant. | ) ) | FILED: May 13, 2019 |

SMITH, J. — Jason Becktel appeals his conviction for second degree murder with a firearm. He argues that the trial court erred by excluding evidence that the victim, Allen Kesterson, had previously been convicted of assault. He also challenges a number of sidebars that occurred during trial and raises various additional issues in a statement of additional grounds for review (SAG). Because evidence of Kesterson's prior conviction was properly excluded under evidence rules that are neither arbitrary nor disproportionate to the purposes they are designed to serve, we hold that the trial court did not err by excluding that evidence. We also hold that because Becktel has not established that the sidebars addressed anything other than nonsubstantive procedural matters or routine evidentiary rulings, the public trial right did not attach to them. Finally, we hold that none of the issues raised in Becktel's SAG require reversal. Therefore, we affirm Becktel's conviction. But due to recent changes in the law, we remand to the trial court to strike the $200 criminal filing fee and interest on nonrestitution legal financial obligations (LFOs) imposed at sentencing.

FACTS

The State charged Becktel with first degree premeditated murder with a firearm enhancement after he shot and killed Kesterson on January 1, 2015. At trial, the jury heard testimony that on December 31, 2014, Becktel and his then girlfriend, Sammi Skore, attended a New Year's Eve party hosted by Alicia German and Dustin Walden at Walden's home in Concrete, Washington. Skore brought her firearm, a 40-caliber Smith & Wesson handgun, with her as a safety precaution. Skore testified that Becktel knew she brought her handgun with her, but that it was her desire to bring it and she was the one who placed it in the couple's truck. When Becktel and Skore arrived at Walden's home, Skore left the handgun in its case in the truck.

Walden testified that approximately 15 or 20 people attended the party, which for the most part took place in a shop structure on his property. Several partygoers testified that everyone had a good time drinking and dancing. Kesterson, who was Walden's neighbor and was older than the other partygoers, spent much of the party tending to a fire outside the shop. Becktel had never met Kesterson before but described him as a "lo[ ]ner." In a statement to detectives, Becktel later indicated that Kesterson was "creeping [him] out."

Most of the partygoers had left by about 12:30 or 1:00 a.m., and Becktel, Skore, Walden, German, and Kesterson were the last ones remaining. Becktel, Skore, Walden, and German were in the shop. Becktel testified that he was pouring himself a drink when he turned and noticed that Kesterson had come into the shop and, as Becktel described it, "was standing close to me, kind of too

2

close." Becktel told Kesterson to "get the fuck away from me." A verbal altercation took place, and Walden intervened and asked Kesterson to leave.

After Kesterson left, German invited Becktel and Skore to stay the night. Becktel testified that after some discussion, he and Skore decided to stay, had another drink in the shop, and eventually went back into the house after Skore retrieved some blankets from their truck. Once inside the house, Skore lay down on the couch, Becktel sat at her feet, and they chatted until Skore fell asleep.

Becktel testified that after Skore fell asleep, he debated whether to stay or go home. He remained on the couch for about 20 to 30 minutes, then pulled out a can of tobacco, but it was empty. He got up to go outside to the truck to retrieve a full can of tobacco. He estimated that it was after 3:00 a.m. when he went outside.

Once at the truck, Becktel opened the driver's side door and began searching for his tobacco. When he found it, he stood up and heard a noise. He then saw Kesterson walking down the sidewalk toward him with a knife in his hand. Becktel, who did not know Kesterson lived next door, thought it was odd that Kesterson was still there. Becktel "threw the can of chew on the seat and grabbed the pistol case that was on the center where the 4-wheel Drive shifter is, and . . . pulled the gun out of the case." He testified that when he saw the knife in Kesterson's hand, he thought Kesterson was going to stab him because "I don't know what else he would be coming at me with a knife in his hand for, unless he was coming to stab me." Becktel then pulled the slide on the gun, put a round into the chamber, stepped back, closed the door of the truck, and

3

pointed the gun at Kesterson. He told Kesterson to "get the fuck away from me" in a loud voice. Becktel testified that Kesterson turned around and went back toward the house when he saw the gun.

Becktel testified that he followed Kesterson up the sidewalk toward the house, but lost sight of him. Becktel was screaming Skore's name. He testified that the next person he saw was German, who had come out of the house onto the porch. Becktel then heard Kesterson yelling and saw him by the corner of the shop, about 15 or 20 feet away.

German testified that she was awakened by Becktel's yelling, so she got up, dressed, walked out onto the porch, and saw Becktel and Kesterson yelling at each other. She could see that Becktel had a gun behind his back, and after about a minute on the porch, she came off the porch and approached Becktel, stopping a few feet away from him and trying to get everyone to calm down. She testified that Kesterson was initially moving toward Becktel, but stopped when Becktel raised his gun.

Becktel testified that Kesterson's hand was by his side. He testified that although he did not see a knife in Kesterson's hand, he believed that Kesterson was holding a knife because he had been holding one a short time earlier.

Meanwhile, Walden had also woken up and walked onto the porch. He testified that he saw Becktel pointing a gun at Kesterson and German standing about one or two feet away from Becktel. Becktel then fired three shots at Kesterson, who fell on his back. An officer who responded to the scene testified that Kesterson's knife was in its sheath. Kesterson died from his gunshot

4

wounds.

The State charged Becktel with first degree premeditated murder with a firearm enhancement. Becktel's theory at trial was that he acted in self-defense. In support of this theory, Becktel moved in limine to introduce evidence that Kesterson had been convicted of assault for threatening his brother-in-law with a knife during a domestic incident that took place on December 9, 2010. The court denied the motion.

The jury acquitted Becktel of first degree murder but convicted him of the lesser included offense of second degree murder with a firearm enhancement. Becktel appeals.

## ANALYSIS

### Evidence of Kesterson's Prior Assault Conviction

Becktel argues that the trial court erred by excluding evidence relevant to his self-defense theory. Specifically, Becktel asserts that evidence of Kesterson's prior assault would have corroborated Becktel's testimony regarding the confrontation that took place at Becktel's truck. He acknowledges that ER 404 and ER 405 prohibit the use of specific instances of a victim's conduct to prove the victim's character for purposes of showing conformity therewith, but argues that this prohibition impermissibly impaired his constitutional right to present a defense. We disagree.

### Standard of Review

A trial court's interpretation of an evidence rule is a matter of law reviewed de novo. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A claim of

a denial of the right to present a defense is also a matter we review de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

*Discussion*

Under ER 404(a), "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." ER 404(a)(2) provides an exception to this rule for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused." But even under this exception, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). Rather, in the self-defense context, reputation testimony is the only permissible method of proving a victim's character to show that the victim acted in conformity with that character. State v. Hutchinson, 135 Wn.2d 863, 886-87, 959 P.2d 1061 (1998). That said, evidence of the victim's specific acts *is* admissible in a self-defense case if the defendant knew of them before he committed the crime charged. State v. Adamo, 120 Wash. 268, 271, 207 P. 7 (1922). But in this context, the specific acts are not being admitted to prove that the victim acted in conformity therewith, as prohibited by ER 404(b). Instead, the evidence is admitted to show the reasonableness of the defendant's fear of the victim. State v. Burnam, 4 Wn. App. 2d 368, 376, 421 P.3d 977, review denied, 192 Wn.2d 1003 (2018).

The Washington State Supreme Court confirmed these rules in Hutchinson. There, the defendant argued that he acted in self-defense when he shot and killed a police officer. Hutchinson, 135 Wn.2d at 867-68, 887. In

support of his argument, the defendant attempted to introduce testimony from witnesses who would have testified about specific violent acts allegedly committed by the officer. Hutchinson, 135 Wn.2d at 886. Citing ER 404(a) and ER 405, the Supreme Court concluded that "[t]he trial court correctly excluded these witnesses' testimony because evidence of a character trait—here, [the victim's] allegedly violent disposition—must be in the form of reputation evidence, not evidence of specific acts." Hutchinson, 135 Wn.2d at 886.

Here, the trial court relied on Hutchinson to conclude that evidence of Kesterson's prior assault was inadmissible under ER 404 and ER 405. The trial court's interpretation of these rules was correct. Because Becktel raised self-defense, the trial court properly held that under ER 404, ER 405, and Hutchinson, evidence of Kesterson's prior assault was not admissible to show that Kesterson acted in conformity therewith, i.e., by threatening Becktel with a knife during the confrontation at Becktel's truck.

Becktel contends that even if the trial court properly applied ER 404 and ER 405 under Hutchinson, his constitutional right to present a full defense "transcends the evidence rules." He then argues that by excluding evidence of Kesterson's prior assault under these evidence rules, the trial court deprived him of his right to present a defense. We disagree.

As an initial matter, Becktel asks this court to apply the wrong test to analyze his claim. Relying on Jones, Becktel argues that "[t]he constitutional right to present a complete defense includes the right to present evidence relevant to the defense, even if otherwise excluded by the evidence rules." Again

relying on Jones, Becktel asserts that "[i]f . . . evidence is relevant to the defense, *it must be admitted unless the State can show it is so prejudicial as to disrupt the fairness of the fact-finding process at trial.*" (Emphasis added.)

But examination of Jones reveals that Becktel is incorrect. In Jones, the defendant, Christopher Jones, was accused of forcibly raping his niece, K.D. Jones, 168 Wn.2d at 717. Jones wished to testify that the sexual encounter was consensual and, specifically, that it took place during an all-night alcohol- and cocaine-fueled sex party in which both Jones and K.D. participated. Jones, 168 Wn.2d at 717. The trial court ruled that Jones could not so testify and also refused to allow Jones to cross-examine witnesses about the sex party. Jones, 168 Wn.2d at 717-18. A jury convicted Jones of second degree rape. Jones, 168 Wn.2d at 718-19.

On appeal, our Supreme Court considered whether the trial court's ruling violated Jones's right to present a defense, as well as his right to confront witnesses. Jones, 168 Wn.2d at 720. In ultimately reversing Jones's conviction, the court did state, as Becktel points out: "'[I]f [evidence is] relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" Jones, 168 Wn.2d at 720 (first alteration in original) (quoting State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). But the court quoted Darden for this proposition, and Darden was strictly a confrontation case. Darden, 145 Wn.2d at 619. The confrontation right and the right to present a defense, though related, are "two separate rights." State v. Hudlow, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). And the test described in

Darden and quoted in Jones was part of a balancing test that the Darden court explained determines the scope of the *confrontation* right. Darden, 145 Wn.2d at 621.

But here, Becktel does not argue that the exclusion of Kesterson's prior assault deprived him of his right to confront any witness. Instead, the thrust of Becktel's argument is that he was deprived of an opportunity to bolster his *own* testimony with evidence of Kesterson's assault. Therefore, the Darden test does not apply here, and we do not consider whether the State has shown that "the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial." Darden, 145 Wn.2d at 622.[1]

Rather, in the right-to-present-a-defense context, we recognize that "[t]he defendant's right [to present a defense] is subject to reasonable restrictions and must yield to 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" State v. Donald, 178 Wn. App. 250, 263-64, 316 P.3d 1081 (2013) (footnote omitted) (quoting State v. Finch, 137 Wn.2d 792, 825, 975 P.2d 967 (1999)). We also recognize that "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'" State v. Lizarraga, 191 Wn. App. 530, 553, 364 P.3d 810 (2015) (quoting United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)). These

---

[1] Indeed, accepting Becktel's argument that any evidence relevant to the defense must be admitted unless the State can show that its prejudice outweighs the defendant's need—even if the evidence is, as it was here, properly excluded under a correct interpretation of the evidence rules—would render the evidence rules meaningless.

exclusionary evidence "'rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.'" Lizarraga, 191 Wn. App. at 553 (internal quotation marks omitted) (quoting Scheffer, 523 U.S. at 308). Therefore, to analyze Becktel's right-to-present-a-defense claim, we consider whether ER 404 and 405—and the trial court's exclusion of evidence in accordance with those rules— are arbitrary or disproportionate to the purposes those rules are designed to serve. We conclude that they are not.

Donald is instructive. There, the defendant, Harold Donald, was convicted of assault and attempted robbery. Donald, 178 Wn. App. at 255. At trial, Donald's defense was that another suspect, Lorenzo Leon, had alone committed the crimes. Donald, 178 Wn. App. at 254. In support of his theory, Donald attempted to introduce evidence of Leon's extensive criminal history. Donald, 178 Wn. App. at 254. The trial court excluded this evidence under ER 404(b), which, as discussed, generally prohibits the use of prior specific acts to show circumstantially that a person acted consistently therewith on a particular occasion. Donald, 178 Wn. App. at 257-58.

On appeal, Donald argued that "his constitutional right to present a defense and the policy behind ER 404(b) should cause [the court] to construe the plain language of ER 404(b) prohibiting propensity evidence inapplicable when a defendant offers this evidence to support his defense." Donald, 178 Wn. App. at 258. We disagreed and explained:

> Excluding Leon's criminal history did not significantly undermine
> any fundamental element of Donald's defense. It did not exclude

any witness with knowledge of any fact of the alleged crimes or any part of that witness's testimony. It did not exclude any testimony from Donald. He still could present all of the facts relevant to Leon's involvement in the assault . . . . *ER 404(b) prevented him only from presenting propensity evidence the common law generally excludes because it is distracting, time consuming, and likely to influence a fact finder far beyond its legitimate probative value. Exclusion of propensity evidence furthers two goals that [the United States Supreme Court] recognized as reasonable. It ensures the reliability of evidence introduced at trial and avoids litigation collateral to the primary purpose of the trial. . . . [T]he per se exclusion of propensity evidence to prove how a person acted on a particular occasion is not disproportionate to the ends it is designed to serve.*

Donald, 178 Wn. App. at 268 (emphasis added) (footnote omitted).

Here, as in Donald, the trial court's application of ER 404 and ER 405 to exclude evidence of Kesterson's prior assault only prevented Becktel from excluding propensity evidence that is generally excluded because it is "distracting, time consuming, and likely to influence a fact finder far beyond its legitimate probative value." Donald, 178 Wn. App. at 268. Specifically, evidence that Kesterson threatened his brother-in-law with a knife during a domestic incident that occurred four years before the shooting had little probative value with regard to whether Becktel justifiably shot Kesterson. Furthermore, that evidence could well influence the jury far beyond its legitimate probative value. Therefore, as in Donald, exclusion of the evidence furthered the goals of ensuring the reliability of evidence introduced at trial and avoiding litigation collateral to the primary purpose of the trial, i.e., determining the reasonableness of Becktel's actions.

Additionally, excluding evidence of Kesterson's criminal history did not significantly undermine any fundamental element of Becktel's defense. As in

11

Donald, it did not exclude any witness with knowledge of any fact of Becktel's alleged crime, any part of that witness's testimony, or any testimony from Becktel himself. Rather, Becktel was able to present all of the facts relevant to his self-defense theory. Indeed, Becktel's account of his confrontation with Kesterson at the truck was not contradicted. Becktel argues otherwise by pointing out that during his cross-examination, the prosecutor questioned him "with skepticism." But a cross-examination is not the same as conflicting testimony from witnesses.

In short, ER 404 and ER 405 and the trial court's application thereof were neither arbitrary nor disproportionate to the purposes those rules are designed to serve. Therefore, Becktel was not deprived of his right to present a defense when the trial court applied those rules to exclude evidence of Kesterson's prior assault.

Relying on State v. Cayetano-Jaimes, 190 Wn. App. 286, 359 P.3d 919 (2015), Becktel argues that "[p]er se rules that exclude an entire class of testimony may violate a defendant's constitutional right to present a complete defense." Becktel's reliance on Cayetano-Jaimes is misplaced. In that case, the defendant, Arturo Cayetano-Jaimes, was charged with first degree rape of his niece, V. Cayetano-Jaimes, 190 Wn. App. at 289, 291. V. had reported that Cayetano-Jaimes had once engaged in sexual contact with her while Cayetano-Jaimes and his wife were babysitting V. and her sister. Cayetano-Jaimes, 190 Wn. App. at 289-90. At trial, Cayetano-Jaimes moved to admit the telephonic testimony of Laura Camacho, V.'s mother, who was unavailable to testify in person. Cayetano-Jaimes, 190 Wn. App. at 289, 291. Camacho would have

testified that she and V.'s stepfather never left their girls in Cayetano-Jaimes' care during the time that Cayetano-Jaimes lived in Washington. Cayetano-Jaimes, 190 Wn. App. at 291. The court denied the motion and excluded Camacho's telephonic testimony. Cayetano-Jaimes, 190 Wn. App. at 291, 294. A jury convicted Cayetano-Jaimes as charged. Cayetano-Jaimes, 190 Wn. App. at 294.

On appeal, we analyzed whether, considering the constitutional rights at issue, the trial court erred by excluding Camacho's testimony, observing that "[c]ourt rules may not prevent a defendant from presenting highly probative evidence vital to the defense." Cayetano-Jaimes, 190 Wn. App. at 297, 298. We concluded that the trial court did err because its ruling "deprived Cayetano-Jaimes of relevant, material evidence vital to his defense." Cayetano-Jaimes, 190 Wn. App. at 300. We observed that "Camacho's testimony, if believed, provided a *complete defense* to the charged crime. Therefore, 'it is evidence of extremely high probative value; it is [the defendant's] entire defense.'" Cayetano-Jaimes, 190 Wn. App. at 300 (emphasis added) (alteration in original) (quoting Jones, 168 Wn.2d at 721).

Here, the evidence of Kesterson's prior crime was not, like the evidence in Cayetano-Jaimes, highly probative. Again, evidence of Kesterson's prior conviction for an assault that occurred during a domestic incident four years earlier had little probative value with regard to whether Becktel justifiably shot Kesterson. That evidence also was not vital to Becktel's defense: Even if the jury believed Becktel's testimony that Kesterson initiated the confrontation at

13

Becktel's truck, it still had to decide whether Becktel acted reasonably when he and Kesterson confronted each other again a short time later. Specifically, the jury had to decide whether Becktel (a) "reasonably believed that [Kesterson] intended to inflict death or great personal injury," (b) "reasonably believed that there was imminent danger of such harm being accomplished," and (c) "employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to [Becktel]." In short, the evidence of Kesterson's prior assault was not, like the evidence in Cayetano-Jaimes, Becktel's entire defense.

Moreover, the trial court in Cayetano-Jaimes excluded Camacho's testimony "because it believed the jury could not evaluate her credibility if it could not see her." Cayetano-Jaimes, 190 Wn. App. at 301. In reversing the trial court, we explained that "[o]bservations of a witness's demeanor do not provide the only way to evaluate that witness's credibility" and that the State had offered no explanation why other means of challenging Camacho's credibility would be insufficient. Cayetano-Jaimes, 190 Wn. App. at 301. In other words, we recognized in Cayetano-Jaimes that by excluding highly probative evidence vital to the defense merely because it was telephonic, the trial court applied a rule that was disproportionate to the purposes it was designed to serve. But as discussed, the evidentiary rules the trial court applied here to exclude evidence of Kesterson's prior assault were neither arbitrary nor disproportionate to the purposes they are designed to serve. Therefore, Becktel's reliance on Cayetano-Jaimes is misplaced.

14

Becktel also relies again on Jones to argue that the trial court's ruling violated his right to present a defense. Like his reliance on Cayetano-Jaimes, Becktel's reliance on Jones is misplaced. As discussed, the defendant in Jones wished to testify that his sexual contact with his niece was consensual and took place during an all-night sex party in which both he and his niece participated. Jones, 168 Wn.2d at 717. The trial court excluded the defendant's testimony under the rape shield statute. Jones, 168 Wn.2d at 717-18. The Washington State Supreme Court ultimately concluded that the rape shield statute did not apply, that the sex party evidence was the defendant's "entire defense," and that "even if the rape shield statute *did* apply, the sex party testimony is of extremely high probative value and cannot be barred without violating the Sixth Amendment." Jones, 168 Wn.2d at 724. In other words, Jones simply recognizes that rules that prevent a defendant from introducing highly probative evidence vital to his defense may be unconstitutionally arbitrary or disproportionate to the purposes they are designed to serve. Cf. Scheffer, 523 U.S. at 308 (observing that United States Supreme Court has found exclusion of evidence to be unconstitutionally arbitrary or disproportionate only when it infringes on "a weighty interest of the accused"). But as discussed, the evidence Becktel sought to introduce here was neither highly probative nor vital. Therefore, Jones does not require reversal.

Becktel next suggests that Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967), support reversal. But neither case is

15

persuasive here. <u>Chambers</u> involved Mississippi's "party witness" or "voucher" rule, which barred a party from impeaching its own witness. <u>Chambers</u>, 410 U.S. at 294. As a result of that rule, the defendant in <u>Chambers</u> was prohibited from cross-examining a witness who had confessed to the crime charged but who later repudiated his confession. <u>Chambers</u>, 410 U.S. at 294. In concluding that the defendant was deprived of due process, the United States Supreme Court observed that the defendant was also barred from presenting other witnesses who would have discredited the confessing witness's repudiation. <u>Chambers</u>, 410 U.S. at 292, 294. It also noted that Mississippi failed to explain the underlying rationale for the voucher rule, which the Court observed "appears to be a remnant of primative English trial practice." <u>Chambers</u>, 410 U.S. at 296-97.

<u>Washington</u> involved Texas statutes that barred a person charged as a participant in a crime from testifying on behalf of another alleged participant. <u>Washington</u>, 388 U.S. at 16-17. The Court held that the Texas statutes, which it characterized as absurd, violated the Sixth Amendment by arbitrarily excluding entire categories of defense witnesses from testifying based on a presumption that they were unworthy of belief. <u>Washington</u>, 388 U.S. at 22.

As the United States Supreme Court itself later observed, both <u>Chambers</u> and <u>Washington</u> involved the exclusion of evidence that "significantly undermined fundamental elements of the defendant's defense." <u>Scheffer</u>, 523 U.S. at 315. Furthermore, <u>Chambers</u> and <u>Washington</u> both involved rules that the Court described as primitive, arbitrary, or absurd. As already discussed, that was not the case here. Therefore, <u>Chambers</u> and <u>Washington</u> are distinguishable and do

not control.

Becktel next argues that we should follow the lead of other states that allow, in self-defense cases, the admission of the victim's specific acts—whether or not the defendant knew of them—to prove the victim's character for purposes of showing that the victim was the first aggressor. But Becktel did not know of Kesterson's prior assault conviction before shooting him, and Washington has long followed the rule that for a victim's specific acts to be admissible in a self-defense case, the defendant must have known of those specific acts before the time he committed the crime charged. Adamo, 120 Wash. at 271; cf. State v. Duarte Vela, 200 Wn. App. 306, 323-24, 402 P.3d 281 (2017) (holding that trial court violated defendant's right to present a defense by excluding evidence of victim's prior threats that were known to the defendant), review denied, 190 Wn.2d 1005 (2018). That some other states have adopted a different rule that allows admission of the victim's specific acts—whether or not the defendant knew of them—does not mean that Washington's rule is arbitrary or disproportionate to the purposes it is designed to serve. Becktel's argument fails.

As a final matter, Becktel argues that because Washington permits reputation evidence to prove character under ER 405, prior acts should also be admissible to prove character because they are "more probative" than reputation evidence. He relies on an advisory committee note to Federal Rule of Evidence 405 that states: "Of the three methods of proving character provided by the rule, evidence of specific instances of conduct is the most convincing." FED. R. EVID. 405 Advisory Committee's Note, 56 F.R.D. 183, 222 (1973). But Becktel omits

the remainder of that committee note, which explains that evidence of specific acts is also the most prejudicial:

> At the same time[, *evidence of specific acts] possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time.* Consequently the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry. . . . This treatment is, with respect to specific instances of conduct and reputation, conventional contemporary common law doctrine.

56 F.R.D. at 222 (emphasis added). In other words, the committee clearly considered the potential probative value of specific acts, weighed it against their likely prejudicial effect, and deemed them inadmissible for purposes of showing character except when the issue of character is strictly at issue. Therefore, the committee's note does not support Becktel's argument here. Rather, the committee's weighing of the probative value of specific acts against their prejudicial effects confirms that ER 405 is neither arbitrary nor disproportionate to the purpose it is designed to serve. The trial court did not deprive Becktel of the right to present a defense by applying this rule, together with ER 404, to exclude evidence of Kesterson's prior assault.

## Public Trial

Becktel argues that the trial court violated his right to a public trial by holding 20 sidebars that were neither recorded nor memorialized for the record. Because Becktel has not established that the public trial right attached to these sidebars, we disagree.

Both the state and federal constitutions guarantee criminal defendants the right to a public trial. State v. Brightman, 155 Wn.2d 506, 514, 122 P.3d 150 (2005). "The public trial right serves to ensure a fair trial, to remind the officers of

the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." Brightman, 155 Wn.2d at 514. "A public trial right violation may be raised for the first time on appeal." State v. Karas, 6 Wn. App. 2d 610, 617, 431 P.3d 1006 (2018).

The public trial right is not absolute. State v. Wise, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). "[W]hile openness is a hallmark of our judicial process, there are other rights and considerations that must sometimes be served by limiting public access to a trial." Wise, 176 Wn.2d at 9. To that end, we use a three-step analysis to determine whether a defendant's public trial right has been violated. State v. Love, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). First, we ask whether the public trial right attaches to the proceeding at issue. Love, 183 Wn.2d at 605. Second, if the right attaches, we then ask whether the courtroom was closed. Love, 183 Wn.2d at 605. Third, if the courtroom was closed, we ask whether the closure was justified. Love, 183 Wn.2d at 605. "The appellant carries the burden on the first two steps; the proponent of the closure carries the third." Love, 183 Wn.2d at 605.

Washington courts apply the experience-and-logic test to determine whether the public trial right attaches to a particular proceeding. State v. Smith, 181 Wn.2d 508, 514, 334 P.3d 1049 (2014). "'The first part of the test, the experience prong, asks whether the place and process have historically been open to the press and general public. The logic prong asks whether public access plays a significant positive role in the functioning of the particular process in question.'" Smith, 181 Wn.2d at 514 (internal quotation marks omitted)

(quoting State v. Sublett, 176 Wn.2d 58, 73, 292 P.3d 715 (2012)). "The guiding principle is 'whether openness will enhance[ ] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" Smith, 181 Wn.2d at 514-15 (alteration in original) (internal quotation marks omitted) (quoting Sublett, 176 Wn.2d at 75).

In Smith, the Washington State Supreme Court held that the public trial right does not attach to "proper" sidebars because (1) sidebars deal with "mundane issues implicating little public interest," (2) sidebars "have traditionally been held outside the hearing of both the jury and the public," and (3) "allowing the public to 'intrude on the huddle' would add nothing positive to sidebars in our courts." Smith, 181 Wn.2d at 516, 519. The court held that the sidebars at issue in that case, which dealt with evidentiary rulings, were proper sidebars. Smith, 181 Wn.2d at 519. It reasoned, "[E]videntiary rulings that are the subject of traditional sidebars do not invoke any of the concerns the public trial right is meant to address regarding perjury, transparency, or the appearance of fairness." Smith, 181 Wn.2d at 518. The court also noted that the sidebars at issue were contemporaneously memorialized and recorded, which negated any concern about secrecy. Smith, 181 Wn.2d at 518. The court later confirmed in State v. Whitlock, 188 Wn.2d 511, 396 P.3d 310 (2017), that "proper" sidebars are those that (1) deal with mundane issues implicating little public interest, (2) are done only to avoid disrupting the flow of trial, and (3) are promptly memorialized for the record. Whitlock, 188 Wn.2d at 522.

Here, Becktel, who bears the burden of demonstrating that the public trial

20

right attaches, has not shown that the sidebars extended beyond "'mundane issues implicating little public interest.'" See Whitlock, 188 Wn.2d at 522 (quoting Smith, 181 Wn.2d at 516). Indeed, Becktel concedes that 8 of the sidebars "apparently involved mundane topics such as scheduling, use of the courtroom recording equipment, or other non-substantive procedural issues." He asserts that the remaining 12 sidebars involved evidentiary matters but does not point to anything in the record indicating that these sidebars addressed anything other than routine evidentiary rulings, which are within the traditional province of sidebars. Smith, 181 Wn.2d at 518. Although the court certainly should have recorded or memorialized each sidebar under Smith, it does not follow that the trial court violated Becktel's public trial right by not doing so. Cf. Karas, 6 Wn. App. 2d at 620 (rejecting argument that anything that is not a proper sidebar implicates the public trial right).

Becktel chiefly relies on Whitlock to argue that the public trial right attached to the sidebars at issue here. But that reliance is misplaced. Whitlock involved an in-chambers conference during which the trial court ruled on the prosecutor's objection to the defense's line of cross-examination of a witness. Whitlock, 188 Wn.2d at 516. The prosecutor objected because he viewed the cross-examination as an attempt to intimidate the witness by revealing she was a police informant. Whitlock, 188 Wn.2d at 516. On appeal, the Washington State Supreme Court held that the in-chambers proceeding violated the public trial right. Whitlock, 188 Wn.2d at 524. It reasoned that the proceeding involved "a matter easily accessible to the public: informants and their motives to curry favor

21

with authority." Whitlock, 188 Wn.2d at 523. Additionally, the in-chambers proceeding in Whitlock took place during a bench trial; therefore, "[t]he entire objection could have been argued on the record at any time with no inconvenience to anyone." Whitlock, 188 Wn.2d at 523.

Here, unlike in Whitlock, the sidebars at issue did not take place in chambers and did not occur during a bench trial. Furthermore, the sidebar at issue in Whitlock was eventually memorialized, so the subject matter of the sidebar was part of the record on appeal. Whitlock, 188 Wn.2d at 522-23. Here, by contrast, none of the sidebars were memorialized. Therefore, Becktel cannot establish on this record that the sidebars addressed anything other than nonsubstantive procedural matters or routine evidentiary rulings. Cf. State v. McFarland, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995) (on direct appeal, reviewing court will not consider matters outside the trial record; personal restraint petition is proper vehicle for bringing those matters before the court). Accordingly, Whitlock is distinguishable and does not control.

Statement of Additional Grounds

Becktel raises several issues in his SAG. None require reversal.

First, Becktel asserts that the trial court erred by not providing him a new jury panel "after an employee from the sheriff's office informed the entire panel [he] was incarcerated." But he does not indicate where in the record this alleged incident occurred, nor does he point to anything in the record suggesting that any jurors were prejudiced thereby. Therefore, this claim fails. See State v. Ollison, 68 Wn.2d 65, 69, 411 P.2d 419 (1966) (rejecting challenge to trial court's denial

of mistrial motion when the only evidence regarding whether potential jurors were prejudiced by possibly having seen the defendant in handcuffs was defense counsel's statements); see also RAP 10.10(c) (appellate court not obligated to search record in support of claims made in SAG).

Second, Becktel asserts that the prosecutor "in his closing statement intentionally gave false and misleading information to the jury and then at the end of his statement revealed that what he said wasn't factual, just what he thought may have happened." But "[t]o prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). Becktel neither specifies the comments he argues were improper nor explains how those comments prejudiced him. Therefore, his claim fails.

Third, Becktel argues that the trial court erred by denying his motion to suppress statements he made to law enforcement. He contends that the court's conclusion that he was in custody was based on contradictory statements made by the judge and by an officer who testified that Becktel was not free to leave when he made his statement. But the trial court concluded that even if Becktel were in custody at the time of his statements, he was properly advised of—and waived—his Miranda[2] rights. Therefore, Becktel's argument is without merit.

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Fourth, Becktel asserts that he "was never informed by [his] attorney that the photos of the alleged victim after death could be suppressed and not shown to the jury." But a defendant alleging ineffective assistance of counsel must establish both that his counsel's performance was deficient and that the deficiency prejudiced him. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Here, Becktel does not specify how his counsel's alleged failure prejudiced him. Therefore, his claim fails.

Finally, Becktel asserts that "[t]he Court suggested that because [Becktel] was larger in size than Kesterson [he] should not have been afraid of him with a knife brandished or not." But Becktel does not state where in the record the court's statement occurred. Therefore, we decline to consider this additional ground for review because it does not adequately inform us of the nature and occurrence of the error that Becktel alleges, and we are not obligated to search the record in support of Becktel's claim. RAP 10.10(c).

### Criminal Filing Fee and Interest on Nonrestitution LFOs

As a final matter, Becktel argues that the trial court should be instructed to strike the $200 criminal filing fee and interest on nonrestitution LFOs from the judgment and sentence. We agree.

When Becktel was sentenced, the trial court assessed a mandatory criminal filing fee and ordered that all LFOs would bear interest from the date of judgment. During the pendency of this appeal, the relevant LFO statutes were amended as follows: Former RCW 36.18.020(2)(h) (2015) was amended to provide that the filing fee "shall not be imposed on a defendant who is indigent."

24

LAWS OF 2018, ch. 269, § 17, at 1632. And former RCW 10.82.090 (2015) was amended to provide that "no interest shall accrue on nonrestitution legal financial obligations." LAWS OF 2018, ch. 269, § 1, at 1615. In State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018), the Washington State Supreme Court held that these amendments apply to cases that were pending on direct review and not yet final when the amendments were enacted. Ramirez, 191 Wn.2d at 747.

The State does not dispute that Becktel is indigent, and it concedes that the criminal filing fee and interest on nonrestitution LFOs should be stricken. We accept the State's concession.

We affirm Becktel's conviction but remand to the trial court to strike the $200 criminal filing fee and interest on nonrestitution LFOs.

WE CONCUR: