THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Respondent,<br><br>        v.<br><br>SIMEONE THOMAS BERKLEY,<br><br>        Appellant. | No. 82588-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, C.J. — Simeone Thomas Berkley appeals his conviction for second degree murder, arguing that he shot Steven Whitemarsh in self-defense during a road rage incident provoked by Whitemarsh. Berkley contends the trial court erred in excluding evidence that Whitemarsh had previously engaged in aggressive and alcohol-impaired driving, impairing his right to present a defense. He also argues the prosecutor committed misconduct by characterizing his crime as an "execution" and the trial court imposed mandatory legal financial obligations (LFOs) that were unconstitutionally excessive. We reject these arguments and affirm the judgment and sentence.

## FACTS

On the evening of July 6, 2019, as Yuriy Gogun and his daughters drove down Glenwood Avenue in Everett, they saw a car, driven by Simeone Berkley, coming toward them. Gogun saw Berkley turn on his left turn signal and abruptly

Citations and pin cites are based on the Westlaw online version of the cited material.

slow down. Gogun then saw the vehicle following Berkley, driven by Stephen Whitemarsh, collide with the rear end of Berkley's car.

Gogun pulled over and saw Berkley get out of his car and walk up to Whitemarsh's driver's side window. Both Gogun and his daughter, Juliana, testified they then saw Berkley pull out a gun and shoot Whitemarsh twice through the window, pausing three to five seconds between the shots.

Beau Reeder, sitting in his car on Glenwood Avenue, heard a loud crash behind him. When Reeder turned to look, he saw the collision. Reeder grabbed his video camera and, as he got out of his car, heard two gunshots with a short pause in between. Reeder began recording when he saw Berkley walking towards him. Reeder asked him what happened and Berkley responded that the driver of the following vehicle had been chasing him. Reeder then heard the engine of Whitemarsh's car revving loudly. Reeder and Berkley walked together to Whitemarsh's car. Reeder turned off his video camera while he attempted, unsuccessfully, to remove Whitemarsh's leg from the car's accelerator. Berkley reached into the car and took the keys out of the ignition. Reeder turned his video camera back on when Berkley told him, "don't worry about him. I shot him twice in the head." Reeder saw that Whitemarsh was bleeding and heard him moaning.

When police arrived, they found Whitemarsh still seated in his vehicle with his seat belt fastened and his doors locked, with gunshot wounds to his face and head. Whitemarsh died at the scene. The autopsy revealed that Berkley's first shot entered Whitemarsh's lower lip and shattered his jawbone. The second shot entered his skull behind his left ear. The Snohomish County chief medical examiner testified that the shots were fired from a distance of 6 to 24 inches away.

Whitemarsh had a blood alcohol level of .195 and a THC level of 4.7 nanograms per milliliter of blood.

The State charged Berkley with second degree murder. Berkley's theory at trial was that he shot Whitemarsh in self-defense.

Berkley testified that on the evening of the shooting, he was driving on Glenwood Avenue to pick up dinner for himself and his wife. On the way, he noticed Whitemarsh's SUV closely following him. Berkley grew concerned about what he described as Whitemarsh's aggressive driving when, at a stop light, Whitemarsh repeatedly revved his engine directly behind Berkley's vehicle. Berkley claimed he drove at an excessive rate of speed to get away from Whitemarsh, but Whitemarsh continued to tailgate him. At some point, Berkley decided he was "tired of the chase," and slammed on his brakes, causing Whitemarsh's SUV to collide with the back of Berkley's vehicle.

Berkley admitted he then got out of his car, walked over to Whitemarsh's driver's side window, pulled a pistol from his pocket, and shot Whitemarsh twice. He admitted he never saw a weapon and did not exchange any words with Whitemarsh.

To support his theory of self-defense, Berkley sought to introduce three pieces of evidence to demonstrate that Whitemarsh had previously engaged in alcohol-fueled road rage incidents. First, he asked to introduce evidence that the victim's mother, Patricia Whitemarsh, told police that Whitemarsh "is a road rage driver, that he gets angry at drivers, [and] that he carries a weapon in his car." Second, Berkley offered testimony from Alan Cunningham, who had observed Whitemarsh aggressively tailgate another driver in the same manner as described

by Berkley. Third, Berkley sought to introduce Whitemarsh's six prior convictions for driving under the influence (DUI). Berkley argued that this evidence supported his argument that Whitemarsh was the primary aggressor and that Berkley had a reasonable apprehension of harm.

The trial court excluded the evidence under ER 404. The court reasoned that Patricia Whitemarsh's testimony was not "general and neutralized" to constitute admissible reputation evidence and was instead inadmissible opinion evidence. Cunningham's testimony, the court held, was not general reputation evidence, but was information about a single past incident, making it inadmissible propensity evidence under ER 404(a) and inadmissible to establish a common scheme or plan under ER 404(b). With regard to Whitemarsh's DUI convictions, the court held that they were inadmissible evidence of prior bad acts under ER 404(a), inadmissible propensity evidence under ER 404(b), and not probative of whether Whitemarsh was the aggressor.

The jury found Berkley guilty of second degree murder and the court sentenced him to 264 months of confinement.

ANALYSIS

Berkley's Right to Present a Defense

Berkley first argues the trial court's exclusion of the evidence of Whitemarsh's history of impaired and aggressive driving violated his right to present a defense. We disagree.

In analyzing whether a trial court's evidentiary decision violated a defendant's right to present a defense under the Sixth Amendment to the United States Constitution, we first review the court's evidentiary ruling for abuse of

discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022) (citing *State v. Arndt*, 194 Wn.2d 784, 813, 453 P.3d 696 (2019)). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. *Jennings*, 199 Wn.2d at 59. We then consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Id*. at 58.

Berkley argues that the excluded evidence was admissible under either ER 404(a) or (b). We reject these arguments. Under ER 404(a), "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." ER 404(a)(2) provides an exception to this rule for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused." But even under this exception, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation." ER 405(a).

The victim's character need not have been known to the defendant to be admissible on the issue of who was the primary aggressor. *State v. Adamo*, 120 Wash. 268, 270, 207 P. 7 (1922). But evidence of a victim's character "must be in the form of reputation evidence, not evidence of specific acts." *State v. Hutchinson*, 135 Wn.2d 863, 886, 959 P.2d 1061 (1998) (abrogated on other grounds by *State v. Jackson*, 195 Wn.2d 841, 467 P.3d 97 (2020)). "Specific acts may be used to prove character only where the pertinent character trait is an essential element of a claim or defense. Specific act character evidence relating

- 5 -

to the victim's alleged propensity for violence is not an essential element of self-defense." *Id*. at 886-87. But a defendant may introduce reputation evidence to establish the victim's quarrelsome or violent disposition. *Adamo*, 120 Wash. at 270.

The evidence of Whitemarsh's six DUI convictions and Cunningham's previous single encounter with Whitemarsh constitutes specific act evidence, as opposed to reputation evidence, and is inadmissible under ER 404(a) to prove Whitemarsh was violent when driving.

Whitemarsh's mother's statements to the police are also inadmissible because they do not establish Whitemarsh's reputation in the community as required by ER 404(a). Berkley contends that Mrs. Whitemarsh would have testified that the victim "had a bad temper, frequently got angry while on the road, and kept a weapon in the car—a small baseball bat." Under ER 608(a), to offer reputation testimony under ER 404(a), a party must lay a foundation establishing that the witness's testimony about the victim's reputation is based on perceptions in the community. *State v. Thach*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005); *State v. Callahan*, 87 Wn. App. 925, 935, 943 P.2d 676 (1997) (applying ER 608 test to admissibility of reputation evidence under ER 404(a)). A witness's personal opinion is not sufficient to lay this foundation. *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993). A valid community must be "neutral enough [and] generalized enough to be classed as a community." *State v. Lord*, 117 Wn.2d 829, 874, 822 P.2d 177 (1991) (quotations omitted).

The trial court here reasoned that Mrs. Whitemarsh's testimony was not general enough to constitute reputation testimony, but rather was "opinion

evidence" from "a community of one." The court relied on *Thach*, in which this court held that the testimony of a single family member regarding the defendant's peaceful character was inadmissible as reputation evidence under ER 608(a) because a witness's personal opinion is not sufficient to lay a foundation for an individual's reputation.

*Thach* correctly states the law that reputation testimony must be given by members of a neutral and generalized community. *See Land*, 121 Wn.2d at 500 (factors to consider include the frequency of contact between members of the community, the amount of time a person is known in the community, the role a person plays in the community, and the number of people in the community). In *Thach*, the court noted that "[n]o case law exists supporting the proposition that a family constitutes a community for purposes of character evidence." 126 Wn. App. at 315. Even if Berkley could establish that Whitemarsh's mother was a member of a neutral and generalized community, Berkley presented no evidence as to how Whitemarsh's mother had knowledge of Whitemarsh's reputation in that community. The trial court did not abuse its discretion in excluding her opinion that her son was a "road rage driver."

Berkley also argues that the excluded evidence was admissible under ER 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To the extent that Berkley offered evidence that Whitemarsh drove aggressively on prior occasions to prove that he was the primary aggressor in his

interaction with Berkley, it is propensity evidence prohibited by the plain text of the rule. The trial court correctly ruled that this evidence was inadmissible on that basis.

Berkley, however, also argues that the evidence was admissible to prove that he had a reasonable apprehension of Whitemarsh. Berkley cites *State v. Young*, 48 Wn. App. 406, 739 P.2d 1170 (1987), a vehicular homicide case in which the defendant, who was driving the car, claimed that his passenger caused the fatal accident by grabbing his steering wheel and causing him to lose control. *Id*. at 408-09. The defendant sought to introduce testimony that the passenger had repeatedly grabbed the steering wheels of other drivers in the past, evidence the trial court excluded. *Id*. at 409.

This court held the evidence was admissible under ER 404(b) to prove the identity of the person responsible for the accident and the person in control of the vehicle when the accident occurred. *Id*. at 413. But Berkley fails to explain how the reasoning in *Young* applies here, where he sought to introduce evidence of prior acts, not to prove identity, but to prove his reasonable apprehension of Whitemarsh. *Young* is inapplicable to the facts of this case.

Berkley also cites *State v. Duarte Vela*, 200 Wn. App. 306, 402 P.3d 281 (2017), in which the court held that testimony concerning a murder victim's prior violent and threatening behavior towards the defendant's family was admissible to support the defendant's self-defense claim. The court reasoned: "Here, Duarte Vela was not attempting to prove Menchaca's character. Rather, Duarte Vela was attempting to establish that he reasonably feared Menchaca because of what he believed about Menchaca at the time he shot him." *Id.* at 325-26. But, crucially,

the court continued: "It is well established that a victim's specific acts of violence, *if known by the defendant,* are admissible when the defendant asserts self-defense." *Id*. at 326 (citations omitted; emphasis in original).

Berkley testified he did not know Whitemarsh. And there is no evidence in this record that he knew of Whitemarsh's prior acts of aggressive and impaired driving. It has long been settled law in Washington that evidence of a victim's specific acts is irrelevant to a defendant's reasonable apprehension of that victim unless the defendant knew of the acts. *See Adamo*, 120 Wash. at 271. The trial court did not abuse its discretion by excluding this evidence under ER 404(b).

Berkley argues that even if the evidence was otherwise inadmissible, he should have been permitted to offer it because it was crucial to his claim of self-defense. Both the federal and state constitutions protect the rights of criminal defendants to present a complete defense. U.S. CONST amend. VI; WASH CONST. art. I, § 22; *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). But the right to present a defense is not without limitation. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). For example, "the Constitution permits judges to exclude evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quotations omitted). Moreover, state courts have broad latitude under the constitution to establish rules excluding evidence from criminal trials. *United States v. Scheffer,* 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998). An evidence rule abridges a defendant's right to present a defense when it infringes on a weighty

interest of the defendant and is arbitrary or disproportionate to the purpose it was designed to serve. *Holmes*, 547 U.S. at 324.

In assessing a constitutional challenge to a trial court's evidentiary decision, we must first determine if the evidence is at least minimally relevant. *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021). "If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 63.

The excluded evidence here was not relevant to the reasonableness of Berkley's subjective fear, as Berkley was not aware of either Whitemarsh's alleged reputation for violent behavior or his prior instances of impaired and aggressive driving. In the absence of Berkley's prior knowledge, none of the excluded evidence—Whitemarsh's DUI convictions, his mother's testimony that he was an aggressive driver, or Cunningham's testimony about the previous road rage incident—helps establish that Berkley had a subjectively reasonable belief of imminent harm at the time he shot Whitemarsh in the face and head. While the evidence is relevant for the purposes of corroborating Berkley's testimony that Whitemarsh was the primary aggressor, we nonetheless conclude that the State's interest in excluding this otherwise inadmissible and possibly misleading evidence outweighs Berkley's need to present it.

Recently, in *Jennings*, our Supreme Court applied this balancing test to a trial court's evidentiary ruling excluding a toxicology report showing that the victim in a felony murder case had a high level of methamphetamine in his system. *Id.*

at 53. Jennings argued that the toxicology report was crucial to his claim of self-defense because it corroborated his testimony that he believed the victim was high on methamphetamine when Jennings shot him during a physical altercation. *Id*. at 66.

The Supreme Court concluded that the exclusion of this evidence did not violate Jennings's right to present a defense. The court determined the evidence was only minimally probative because even if the victim was high on methamphetamine during the altercation, there was no qualified expert to testify to the drug's effect on the victim. *Id*. The evidence, it held, would have left the jury to speculate as to what effect the drugs might have had on the victim when determining whether Jennings's fear was reasonable. *Id*. The court further reasoned that, despite the exclusion of the report, Jennings was still able to assert his theory of the case by testifying regarding his subjective fear and his belief that Burton was high on methamphetamine. *Id*. at 67. For these reasons, Jennings's interest in presenting the evidence could not overcome the State's interest in voiding the prejudicial and speculative effect of the report. *Id*.

We reach the same conclusion. Here, as in *Jennings*, the State's interest in excluding potentially misleading and speculative evidence outweighed Berkley's interest in admitting the evidence to corroborate his testimony that Whitemarsh instigated the confrontation leading to the shooting.

First, as in *Jennings*, the evidence was only minimally probative as corroboration of what Berkley testified to at trial. And it could mislead a jury into assuming that if Whitemarsh had threatened to harm a driver without provocation during an earlier incident, he must have similarly threatened Berkley for no reason.

Washington courts typically disfavor evidence intended to suggest that because a person acted wrongfully in the past, they must also be doing so now. *State v. Lee*, 188 Wn.2d 473, 488, 396 P.3d 316 (2017). Similarly, the evidence had a high probability of leading the jury to speculate that Whitemarsh's past acts and behaviors provided Berkley with a reasonable basis for such a belief when in fact Berkley had no knowledge of those events.

Second, the exclusion of the evidence did not limit Berkley's ability to present his theory of the case. He testified and gave his account of Whitemarsh's aggressive behavior with the support of evidence showing that Whitemarsh was greatly impaired during the incident. Multiple eyewitnesses corroborated some aspects of Berkley's account of the events, including that Whitemarsh was driving at an excessive rate of speed and at too close of a distance to avoid the rear-end collision when Berkley unexpectedly braked. Berkley's interest in presenting the excluded evidence thus cannot overcome the inflammatory, marginally relevant, and prejudicial nature of that evidence, and the trial court did not violate his right to present a defense.

Prosecutorial Misconduct

Berkley next argues that the prosecutor committed misconduct when, in closing, he described Berkley's second shot as an "execution." We disagree.

A prosecutor must ensure that they do not violate a defendant's right to a constitutionally fair trial. *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). To establish prosecutorial misconduct, a defendant must show that the prosecuting attorney's statements were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). The defendant must

demonstrate that any improper conduct "'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" *Id.* at 375 (quoting *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). When determining whether prosecutorial misconduct requires reversal, we must review the statement in the context of the entire case. *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

During closing argument in this case, the prosecutor anticipated that Berkley's focus in closing would be on instruction 7, which read in pertinent part:

> It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when committed in the lawful defense of the slayer when:
>
> (1)     the slayer reasonably believed that the person slain intended to inflict death or great personal injury;
> (2)     the slayer reasonably believed that there was imminent danger of such harm being accomplished; and
> (3)     the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

The State pointed out the number of times the word "reasonably" appears in this instruction and argued that "almost nothing Mr. Berkley did from the time he slammed on his brakes to the time he fired the second shot is reasonable."

In discussing the evidence, the prosecutor argued:

> Mr. Whitemarsh is still seat belted in, door is still closed, posed no threat. His hands are empty, no weapons were visible. Yet when he had a gun stuck in his face, he started to turn his head, according to Mr. Berkley, and look around.
>
> So apparently Mr. Whitemarsh did what was natural. When he was faced with a fear, he tried to avoid it. That's what most people

- 13 -

would do. That is a reasonable reaction. And according to Mr. Berkley, that reaction is what justifies shooting Mr. Whitemarsh right in the bottom lip, right through his teeth, right through his jaw, right into his tongue because he started looking around. Still belted in the car, not trying to get out. Hands still empty. Not reaching for anything at that point, even by Mr. Berkley's own version. No visible weapons. He was looking around. So he got shot in the face.

That shot to the face made Mr. Whitemarsh turn his head, according to the defense, and sort of slump over. So Mr. Berkley would have you believe that it's reasonable under those circumstances to then assume he must be reaching for a weapon. He has to get something that can defeat a firearm. Words pretty close to that that Mr. Berkley used.

Even though his gun's in his hand, pointed at Mr. Whitemarsh, safety off, all he had to do is pull the trigger. And that's what he chose to do instead of just waiting to see if there was any actual threat and that was it.

He walked to face his fear out of anger. He put a gun right in the face, and then he uses the reaction to excuse what he does next by shooting Mr. Whitemarsh. And then he uses the further reaction to him shot [sic] to justify doing it again. Now, of course, the evidence will show you it didn't exactly go down that way. But even if you want to accept that as a hundred percent accurate version, it doesn't justify what happened under the law as instructed to you today.

The second shot in this case is probably better characterized as an execution.

Berkley objected to this last statement as "inflammatory," an objection the court overruled, identifying it as "argument."

Berkley argues the use of the word "execution" is impermissibly inflammatory and should be deemed misconduct in a case in which the State knew the victim was arguably the first aggressor. Our Supreme Court has previously held that a prosecutor's statement that the defendant acted as "judge, jury and executioner of the victim" did not constitute prosecutorial misconduct. *State v. Davis*, 141 Wn.2d 798, 873, 10 P.3d 977 (2000). Berkley seeks to distinguish

*Davis* on the basis that the defendant in that case was charged with aggravated first degree murder, whereas Berkley was charged only with second degree murder.

We do not consider this distinction a material one. The State charged Berkley with intentionally causing Whitemarsh's death. The State had to prove and the jury found that "the defendant acted with intent to cause the death of Steven Whitemarsh." In Berkley's closing, his attorney admitted that "[t]his case is not about who killed Mr. Whitemarsh. This case is about Mr. Berkley's mental state. This case is about self-defense and whether or not the use of self-defense was justified in this case." The State's characterization of Berkley's second shot as an "execution," was its way of arguing that Berkley was not acting in self-defense but, instead, made an intentional decision to kill Whitemarsh. In context, we deem the characterization to be an argument based on reasonable inferences from evidence presented at trial.

Berkley relies on *State v. Loughbom*, 196 Wn.2d 64, 470 P.3d 499 (2020), to contend the comment was an unfair characterization of the evidence. That case is also distinguishable. The defendant was convicted of the delivery of methamphetamine. During opening and closing arguments, the prosecutor made repeated remarks about the "the war on drugs." *Id*. at 70. The court held that the prosecutor's multiple references to the war on drugs deprived Loughbom of a fair trial because it "was a thematic narrative designed to appeal to a broader social cause." *Id.* It found significant the fact that

> the prosecutor framed Loughbom's prosecution as representative of
> the war on drugs multiple times over the course of a single-day trial,
> in addition to alluding to the local drug problem during jury selection.

Even more suspect is the near verbatim phrasing invoking the war on drugs at each point in the trial. . . . It follows that this is not a case where the prosecutor inadvertently uttered the phrase war on drugs. This rhetoric was practiced and strategically employed at both ends of Loughbom's trial. Indeed, even the Court of Appeals, which found no misconduct, described the State's use of the war on drugs as the prosecutor's "theme."

*Id*. at 75-76.

In contrast to the prosecutor's comments in *Loughbom*, the prosecutor here mentioned the term "execution" just once and did not engage in the same type of practiced, thematic rhetoric. And the reference to an "execution" was a factual characterization of Berkley's second shot based on evidence at trial, and not an appeal to some larger social issue. The evidence was undisputed that Whitemarsh was still seated, with his seat belt buckled, and still inside his locked car, when Berkley approached the vehicle and fired the first shot, striking Whitemarsh in the face. Berkley then waited a few seconds before firing again, this time striking Whitemarsh in the head. He fired from a distance of only 6 to 24 inches. This evidence supports a reasonable inference that if the first shot was intended to incapacitate Whitemarsh, the only conceivable purpose for the second shot was to end Whitemarsh's life.

Nor can Berkley show that the prosecutor's statement had a substantial likelihood of affecting the verdict. The eyewitness testimony, the video recorded by Reeder, and Berkley's own account of the shooting, supported the State's theory that Berkley caused the car accident, intentionally approached Whitemarsh's vehicle, pulled his gun and shot Whitemarsh to death, when Whitemarsh posed no threat to Berkley. Berkley has failed to demonstrate that the

prosecutor's single reference to the act of pulling the trigger the second time as an "execution" affected the outcome of his trial.

<u>Legal Financial Obligations</u>

For the first time on appeal, Berkley argues that, because he lacks the ability to pay restitution, the victim penalty assessment (VPA), and the DNA collection fee, these mandatory legal financial obligations (LFOs) must be stricken as an unconstitutionally excessive fine. But Berkley did not raise this constitutional challenge below and the record is inadequate to determine whether, in fact, Berkley lacks the financial resources to pay these fees. We therefore decline to reach the issue on its merits here.

At sentencing, the prosecution asked the court to impose a $500 VPA, a $100 biological sample collection fee, court costs, and $6,028.47, in restitution. The prosecutor informed the court that "the little bit I know about Mr. Berkley makes me think he can pay" the LFOs. The prosecutor also stated that "with respect to the financial obligations and firearms, I do know that an emergency response protection order or the ERPO was served soon after this incident, and a number of quality firearms were taken out of Mr. Berkley's house, and they certainly cover these financial obligations that I'm recommending."

Berkley's attorney indicated she did not anticipate having any objection to the amount of the requested restitution. Counsel did ask the court to waive discretionary LFOs because "my client is indigent at this point. He did lose his job once this incident happened and it became public in the media. He is going to prison, so he's obviously not going to be making very much money. I think the most you can make over there is $1.76 an hour." Counsel acknowledged that the

police seized several guns from Berkley's home but stated that "ownership of those weapons has already been transferred to someone else."

The trial court did not inquire of Berkley what assets he had or his ability to pay the LFOs because it decided instead to waive all discretionary LFOs. It ordered Berkley to pay restitution, and the mandatory VPA and DNA collection fee and ordered Berkley to pay these LFOs in monthly installments of $50 per month, commencing 60 days after his release from confinement. The restitution order signed the same day as the judgment and sentence indicates that the restitution amount was based on the parties' agreement.

Berkley now contends the mandatory LFOs are an unconstitutionally excessive fine because he lacks the financial ability to pay them. Both the State and federal constitutions prohibit excessive fines. WASH CONST. art. I, § 14; U.S. CONST. amend. VIII. But Berkley did not raise this argument below. Under RAP 2.5(a), we may refuse to review any claim of error which was not raised in the trial court. A party may raise a claimed error for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). But "[i]f the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Berkley has not demonstrated manifest error because he failed to create a record necessary for this court to conclude he lacks the ability to pay the VPA, the DNA assessment, or restitution. The State contended Berkley had sufficient assets to pay them. In his motion and declaration for an order authorizing the appointment of an attorney at public expense on appeal, Berkley indicated that he

- 18 -

had household income of $2,900 in social security per month. And Berkley testified that, as a mechanical engineer, he worked on aerospace defense contracts and was employed up until the day of the shooting. Berkley admitted he owned a significant number of firearms that, according to the prosecutor, had substantial value and we do not know to whom he transferred ownership when the court entered the ERPO. It is thus not clear from this record that Berkley lacks the ability to pay restitution or the other mandatory LFOs imposed by the trial court. Berkley cannot establish manifest error and we decline to reach the issue under RAP 2.5(a).

Affirmed.

Andrus, C.J.

WE CONCUR:

Chung, J.

Bowman, J.